*This opinion is subject to revision before final publication in the Pacific Reporter*

**2016 UT 47**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

MATTHEW A. MACKIN,
*Appellant,*

*v.*

STATE OF UTAH,
*Appellee.*

No. 20140525
Filed October 21, 2016

On Certification from the Court of Appeals

Third District, Salt Lake
The Honorable Randall N. Skanchy
No. 131904672

Attorneys:

Samuel P. Newton, Kalispell, MT, for appellant

Sean E. Reyes, Att'y Gen., Jeffery S. Gray, Asst. Att'y Gen.,
Salt Lake City, for appellee

JUSTICE PEARCE authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE DURHAM, and JUSTICE HIMONAS joined.

JUSTICE PEARCE, opinion of the Court:

¶1 Matthew A. Mackin snatched a purse from an ex-girlfriend (Ex-girlfriend) believing it contained evidence of her drug use, past thefts, and current plan to steal a motor home. In an alleged attempt to deliver the evidence to the police, Mackin drove away while Ex-girlfriend dove into the car through the passenger window. Mackin began to accelerate, and the two fought over the purse while Ex-girlfriend hung halfway outside the car. Eventually, Ex-girlfriend pulled herself into the vehicle. After they exchanged blows that motivated Mackin to stop the car, the dispute spilled onto the street. Bystanders called the police. Mackin was arrested but insisted that

his actions were justified because he was attempting to stop the theft of a motor home. At trial—in what, to Mackin, must seem like the ultimate example of the axiom "no good deed goes unpunished"— the jury found him guilty of, among other things, aggravated robbery. Mackin argues, first, that the trial court erred when it failed to reduce his conviction from aggravated robbery to robbery and, second, that the court abused its discretion in not granting a continuance to permit Mackin to subpoena additional defense witnesses—including Ex-girlfriend, who was unavailable at trial but whose preliminary hearing testimony the district court permitted the jury to hear. We affirm.

## BACKGROUND[1]

¶2  In May 2013, Mackin was recently released from jail. Mackin and Ex-girlfriend, high on methamphetamines, were lounging in her new boyfriend's motor home. The afternoon began to spoil when Mackin became suspicious that Ex-girlfriend was planning to steal the motor home and flee the state. Mackin found a text on Ex-girlfriend's phone stating, "I have wheels now, I'm leaving the state and I'm not kidding." He also found a map of Nevada "that had 'X's' on it." When Mackin questioned Ex-girlfriend, she responded that it was "none of [his] business." The clincher, however, was a greeting card Mackin found that Ex-girlfriend had written to her new boyfriend—a card that reminded Mackin of something she had sent to him when he was in jail. Mackin decided that his relationship with Ex-girlfriend had run its course. He grabbed Ex-girlfriend's purse and confiscated her cell phone and motor home keys to, in his words, "just stop the theft of a motor home."

¶3 At a pretrial hearing, Ex-girlfriend testified about that afternoon's events. She reported that, after he got high, Mackin began "tearing through" the motor home looking for what he called "evidence." She testified that she "told [Mackin] he was being disrespectful and . . . needed to leave." In her words, Mackin then "picked up [her] purse and . . . proceeded to walk out of the motor

---

[1] "'On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly.' We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346 (citations omitted).

home . . . because [the purse] had the evidence in it." When she tried to stop him, he pushed her away and exited the motor home, fleeing to his car.

¶4 By the time Ex-girlfriend reached Mackin's car, he had already started the engine. Ex-girlfriend leaned through the passenger window to grab her purse. Ex-girlfriend said a "tug of war with [her] purse" ensued as Mackin "proceeded to drive off with [her body] halfway in the car." For the first five feet or so, the car rolled backward as Mackin periodically took his foot off of the brake. Ex-girlfriend claimed she "sidestepp[ed]" along with the car but that Mackin later put the car in gear and "started driving." She testified that, at that point, she was "leaning in through the window and that [her] feet were outside" the car. She also testified that "the more [they] argued while he was driving, and the more [she] tried to grab [her] purse the faster he started going." Ex-girlfriend's testimony about how long and how fast Mackin drove with Ex-girlfriend in that precarious position varies. At one point, Ex-girlfriend testified that her feet were outside of the car for roughly five to ten feet before she pulled her legs in. But she also testified that they were "halfway down the street, I'm not sure" and that "speed [was] picking up" when she was able to "pull [herself] into the car." She repeated that testimony, later stating that she was "halfway down the street when [she] got [her] body into the car," which was going "maybe 25, not even 25 miles an hour."

¶5 Once Ex-girlfriend was in the car, she kicked Mackin repeatedly in the head and, while he was hitting her back, she was "leaning against . . . the passenger door." According to Mackin, her kicks caused him to "see[] stars" and panic, so "after she had kicked [him] almost to the point of unconsciousness," he backhanded her in the face. Ex-girlfriend then opened the car door and began sliding toward the ground, gripping her purse. Mackin said he could see Ex-girlfriend "sliding out the door onto the road as [the car] was moving . . . and her head [was] about four inches off of the road." At that point, Mackin says, he "realized that the situation was getting out of control and someone was going to get hurt." So Mackin stopped the car.

¶6 The fight was not over. Once Mackin stopped the car, Ex-girlfriend landed on the ground on her back. Mackin followed her path through the car and out the door. Mackin said he "[stood] over her . . . holding onto the purse," and that they "screamed a little bit back and forth." Some bystanders said they saw Mackin hit Ex-

girlfriend; others said they heard her scream for help. Mackin confessed he yelled at Ex-girlfriend that she was "going to jail this time." Eventually, several bystanders intervened and called the police.

¶7 Two police officers arrived at the scene and interviewed Mackin, Ex-girlfriend, and the bystanders. One officer observed that Ex-girlfriend was upset, had "an obvious injury to the side of her face," and within half an hour was "already developing a black eye." He handcuffed Mackin and moved him to the back seat of his patrol car. The officer said that bystanders told him that Mackin "was on top of" Ex-girlfriend, that Mackin struck Ex-girlfriend, and that Ex-girlfriend "was just on the ground below [Mackin] screaming for help." The officer arrested Mackin for assaulting Ex-girlfriend. The officer testified that when he explained to Mackin that he was under arrest, Mackin became irate, "swung his legs out" of the patrol car, and began yelling at the officer, "saying that [the officer] was concealing evidence." Mackin then stood up, the officer claimed, "head butted" him, and resisted the officer's attempts to put him back into the car, all while shouting vulgarities at the officer. After he had been placed securely in the patrol car's cage, Mackin used his feet to try to break the door open. The officer said he could "see one portion of [his] vehicle separating from another." The officer also testified that Mackin, in an apparent fit of rage, "banged his head against the side window a couple of times" and even bent the interior "cage out a little bit . . . but wasn't able to escape the cage." En route to the jail, Mackin told the officer that he "was going to burn" the officer, that he could take him "one-on-one," and that the officer "should be assassinated."

¶8 The State charged Mackin with aggravated assault, assault by a prisoner, and damaging a jail, each a third-degree felony. The State also charged Mackin with interference with an arresting officer, and threat of violence, each a class B misdemeanor. Shortly thereafter, the State amended count one of the information from aggravated assault to aggravated robbery.

¶9 At a preliminary hearing, the State introduced the testimony of three witnesses: Ex-girlfriend, the arresting officer, and a witness to the dispute. After hearing from the three witnesses, the judge concluded that probable cause supported the charged offenses and bound Mackin over to face trial.

¶10 Before trial, Mackin's relationship with his defense counsel soured. At a pretrial proceeding two days before trial was set to begin, Mackin's counsel explained to the court that Mackin wanted "his case continued either to prepare his own defense or to get another lawyer." When the court asked Mackin if he wanted to represent himself, Mackin stated that he wanted his counsel removed "on this particular case." Mackin reported that his trial counsel was not working on his behalf, had failed to communicate with him about "any kind of trial strategy," and had failed to subpoena certain favorable witnesses. When the district court inquired about the witnesses who had not been subpoenaed, Mackin indicated that he had a list of individuals who he wanted to testify, but that he had given his counsel "just one [name], the one I can finally come up with." Mackin said that his counsel had helped him find the name of this witness but had not done enough to subpoena the "other witnesses."

¶11 Mackin also told the court he would not be ready to try the case in two days and asked for a continuance. The court declined, explaining that it did not "plan to [continue the trial] just because [Mackin had] unnamed individual witnesses" he wanted subpoenaed. The district court also admonished Mackin, stating that his "suggesti[on] that [his trial counsel] hasn't been working on [his] behalf when [Mackin didn't] even know the names of the witnesses [he] want[ed] him to subpoena is really . . . frivolous." The court cautioned Mackin that if he "intend[ed] not to try this case [in two days], [he had] better file something on [his own] behalf."

¶12 On the day trial was scheduled to commence, Mackin's trial counsel requested—and the court granted—a continuance to allow an evaluation of Mackin's ability to represent himself. Two months later at a pretrial conference, the court set a trial date and ordered Mackin's trial counsel to act as standby counsel with Mackin representing himself. At that conference, Mackin again complained that his standby counsel had failed to subpoena witnesses that he believed were necessary to his defense. The court replied, "I think you decided to be your own counsel and so you do what you want to do but we'll see you [at trial]."

¶13 Trial began, and on the first day, the State asked the court to admit a transcript of Ex-girlfriend's preliminary hearing testimony under rule 804 of the Utah Rules of Evidence. The State claimed it had tried to locate Ex-girlfriend but had been unsuccessful in its attempts to subpoena or otherwise contact her, even though she had

been available to testify at Mackin's first scheduled trial two months earlier. In support of the State's contention that it had made reasonable efforts to produce Ex-girlfriend at trial that day, the court heard testimony from the State's process server and the prosecutor. The process server testified that he began attempting to serve Ex-girlfriend on December 22 at her mother's home, her last known residence. Ex-girlfriend's brother indicated that she "had not been there for quite some time, [and he] didn't know where she could be found." The process server had also searched a utility records database and found another address connected to Ex-girlfriend. A person at that address indicated that Ex-girlfriend had not "been there for several months" and that he had no contact information for Ex-girlfriend other than that she "was probably with" her mother. The process server also checked various public and police records "and was unable to find any other information" regarding Ex-girlfriend. His last attempt to find Ex-girlfriend was on January 13, just two days before trial.

¶14 The prosecutor proffered that he, too, had made numerous attempts to contact Ex-girlfriend. He stated that he had been in close contact with Ex-girlfriend when she was in state custody and that Ex-girlfriend testified at the preliminary hearing shortly after being released from custody. Following the preliminary hearing, the prosecutor experienced difficulties contacting Ex-girlfriend. He stated that the week before trial, Ex-girlfriend left a voicemail message asking about the trial and leaving a callback number. But when he returned Ex-girlfriend's call, someone else answered and told the prosecutor that he would relay the information to Ex-girlfriend. The prosecutor also contacted Ex-girlfriend's mother the day before trial. Ex-girlfriend had picked up her daughter at her mother's house around New Year's Day, but her mother had not seen or heard from Ex-girlfriend since then. Ex-girlfriend's mother also provided the prosecutor with contact information for Ex-girlfriend's daughter's juvenile probation officer, who had no "additional information" to give because he was also unable to contact Ex-girlfriend or her daughter. After hearing the prosecutor's proffer, the district court ordered him to try to contact Ex-girlfriend one last time. The court eventually found that the State's efforts to locate Ex-girlfriend had been reasonable and permitted Ex-girlfriend's preliminary hearing testimony to be admitted under rule 804(b)(1) of the Utah Rules of Evidence.

¶15 Mackin moved the court to continue the trial so that he could locate and subpoena Ex-girlfriend himself. The court asked Mackin if he was aware of "any other avenue by which [Ex-girlfriend] might be located and found today?" Mackin responded, "Just the people that we used to know, she may be at one of those houses. I don't know numbers anymore. It's been too long since I've been in custody and I apologize but that's the best I can do." The court denied Mackin's motion, concluding that Mackin failed to convince it that "today would be any different than any other day in terms of finding [Ex-girlfriend]."

¶16 During trial proceedings, after the jury heard testimony of Mackin's and Ex-girlfriend's tussle for the purse, Mackin's standby counsel moved the court to "dismiss or at least reduce the charge of aggravated robbery" because, he claimed, there was "insufficient evidence to show that a weapon was used in the course of the commission of a theft." The prosecutor opposed the motion to reduce the charge, arguing that Mackin's "use of the vehicle was . . . in a manner that was deadly and dangerous and therefore counts as a weapon." The district court denied Mackin's motion to reduce his charges.

¶17 Also during trial, Mackin objected again to his standby counsel's failure to subpoena "certain witnesses," contending that these witnesses were essential to his story and that, to make up for this defect in his defense, he now needed to testify. Standby counsel told the court Mackin gave him "no contact information with respect to those witnesses or what they would say" and that he could not have subpoenaed them "willy nilly" while still acting "in good faith." Mackin then explained that the missing witnesses would support his claim that he was justified in taking Ex-girlfriend's purse. He told the court their testimonies would demonstrate that Ex-girlfriend (1) stole a cell phone, the motor home, and a purse; (2) was leaving the state in the stolen motor home; and (3) had a bad habit of stealing. Mackin confessed to the court that, in most cases, he provided standby counsel with only the name of a proposed witness without contact information; but he also claimed that in other cases he provided either an address, a personal contact, or incarceration or probation information. In the end, the trial court did not grant Mackin any relief.

¶18 After the State and Mackin each presented their witnesses, Mackin took the stand. He testified that he believed he was justified in taking the purse because he thought it contained evidence of

stolen property. The jury found Mackin guilty of aggravated robbery, assault by a prisoner, damaging a jail, interference with an arresting officer, and attempted escape, but found Mackin not guilty of a threat of violence. The court sentenced Mackin to various indeterminate sentences for his convictions but suspended all but one sentence: 365 days in jail on his attempted escape from official custody conviction.

¶19 Before sentencing, Mackin moved the court to arrest judgment and for a new trial. In his motion, Mackin argued that his standby counsel provided ineffective assistance by failing to subpoena witnesses necessary to his defense. Mackin also argued that the court unlawfully admitted the transcript of Ex-girlfriend's preliminary hearing testimony. The court denied Mackin's motions. Mackin appeals, and this court has jurisdiction under Utah Code section 78A-3-102(3)(b).

## ISSUES AND STANDARDS OF REVIEW

¶20 Mackin first argues that the district court erred by failing to reduce his aggravated robbery charge to robbery. Mackin contends that insufficient evidence supports the jury's finding that he used a dangerous weapon during the course of a robbery and, thus, the district court should have granted his motion to reduce his charge. We grant substantial deference to a jury verdict. *State v. Nielsen*, 2014 UT 10, ¶ 30, 326 P.3d 645. In assessing an insufficiency of the evidence claim, "we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury," and we will reverse the jury's verdict "only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *Id.* (citation omitted).[2]

---

[2] Mackin's reply brief raises a host of issues not raised in his opening brief. He argues both that he did not have the "specific intent to commit a robbery" and that the district court's interpretation of "dangerous weapon" should have been colored by the definition of "dangerous weapon" in a different provision of the criminal code. *See* UTAH CODE § 76-10-501(6). Mackin also contends that the State's efforts to secure Ex-girlfriend's presence at trial were half-hearted and, thus, were insufficient to satisfy the reasonable

(continued . . .)

¶21 Mackin also contends that the district court erred when it denied his motion for a "continuance to secure the attendance of witnesses critical to his defense," including Ex-girlfriend. We review a district court's denial of a motion for a continuance for an abuse of discretion. *State v. Taylor*, 2005 UT 40, ¶ 8, 116 P.3d 360. A district court abuses its discretion when it "denies a continuance and the resulting prejudice affects the substantial rights of the defendant, such that a 'review of the record persuades the court that without the error there was a "reasonable likelihood of a more favorable result for the defendant."'" *Id.* (citation omitted).

## ANALYSIS

### I. SUFFICIENT EVIDENCE SUPPORTS THE JURY'S FINDING THAT MACKIN USED HIS CAR AS A DEADLY WEAPON

¶22 Our Legislature has declared that "[a] person commits aggravated robbery if in the course of committing [a] robbery," the person

> (a) uses or threatens to use a dangerous weapon as defined in Section 76-1-601; (b) causes serious bodily

---

diligence required under the Sixth Amendment to the United States Constitution. He further argues that the State had a duty to disclose to Mackin before trial that it was having difficulties locating Ex-girlfriend and that the State's failure to disclose that information thwarted his ability to adequately prepare for his defense at trial. Additionally, Mackin raises a number of defenses that he claims his missing witnesses would have supported: an "honest belief" defense and an "attempting to report" defense. He further contends that the property did not belong to Ex-girlfriend and, thus, he could not have "robbed" her of it. The rules of appellate procedure require that an appellant's reply brief "be limited to answering any new matter set forth in the opposing brief." UTAH R. APP. P. 24(c). "This requirement is rooted in considerations of fairness. If new issues could be raised in a reply brief, the appellee would have no opportunity to respond to those arguments." *Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903. "It is well settled that 'issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court.'" *Id*. (citation omitted). We therefore do not address arguments Mackin raises for the first time in his reply brief.

injury upon another; or (c) takes or attempts to take an operable motor vehicle.

UTAH CODE § 76-6-302(1). Section 76-1-601 defines a "dangerous weapon" as "any item capable of causing death or serious bodily injury" or "a facsimile or representation of the item, if" the actor "leads the victim to reasonably believe the item is likely to cause death or serious bodily injury" or "represents to the victim . . . that he is in control of such an item." *Id*. § 76-1-601(5)(a)–(b). The aggravated robbery statute also provides that the use of a dangerous weapon "in the course of committing [a] robbery" includes "the immediate flight after the . . . commission of a robbery." *Id*. § 76-6-302(3).

¶23 The State argues that Mackin's vehicle—as used by Mackin—constitutes a dangerous weapon. The State contends that because Mackin's car is "not dangerous *per se*," the State needs to show that "'the object, as used by the defendant, is *capable* of producing serious bodily harm' or death." (quoting *State v. Doporto*, 2005 UT App 455U, para. 4 (quoting 67 AM. JUR. 2D *Robbery* § 5 (2003))). The State borrows that articulation from an unpublished court of appeals decision, which appears to be the only Utah case discussing when a car may be considered a dangerous weapon that converts a robbery into an aggravated robbery. Mackin concedes that in some circumstances a car may be considered a dangerous weapon. But he argues that to meet the statutory definition, a person must not only use the vehicle in the commission of the robbery, but must "1) use[] the vehicle dangerously as 2) part of his overall intent to take another's property, since a vehicle is not ordinarily dangerous of itself."

¶24 In other words, the parties argue that when someone uses or threatens to use an object not normally considered a "dangerous weapon" while committing a robbery, the State must demonstrate that the robber used the item in a manner capable of causing death or serious bodily injury.[3] Neither party advocates that the statute be

_____

[3] The *Doporto* court, and both parties here, draw a distinction between weapons that are *per se* dangerous and those that are not. Neither section 76-1-601 nor section 76-6-302 uses the phrase "*per se* dangerous." It bears noting that other jurisdictions' statutes use or attempt to define similar terms. *See, e.g., Jackson v. State*, 772 S.W.2d

(continued . . .)

read in the most literal fashion. If given its most literal interpretation, a defendant would commit an aggravated robbery if while committing that robbery she "used" "an item capable of causing death or serious bodily injury," even if the manner in which she used it was not capable of causing such damage. Reading the statute in this manner would mean that a defendant who uses a pen to write a note stating "Give me all your money" may have committed an aggravated robbery because a pen, when jammed into a victim's eye, is capable of producing serious bodily injury.[4]

¶25 When interpreting statutes, our object is to evince the will of the Legislature. And we start with the statute's plain language. *2 Ton Plumbing, L.L.C. v. Thorgaard*, 2015 UT 29, ¶ 31, 345 P.3d 675. We have recognized, however, that we should read the plain language in a fashion that prevents other statutory language from becoming inoperative. *State v. Jeffries*, 2009 UT 57, ¶ 9, 217 P.3d 265; *see also Hi-Country Prop. Rights Grp. v. Emmer*, 2013 UT 33, ¶ 24, 304 P.3d 851 (avoiding statutory interpretation that would violate the canon of preserving independent meaning for all statutory provisions); *see also VCS, Inc. v. Utah Cmty. Bank*, 2012 UT 89, ¶ 18, 293 P.3d 290 (avoiding an interpretation that would "run[] afoul of the settled canon of preserving independent meaning for all statutory provisions"). Thus, what the Legislature intended when it required that a defendant "use" a dangerous weapon becomes

---

575, 578 (Tex. App. 1989) ("A handgun is a deadly weapon per se."); TEX. PENAL CODE ANN. § 1.07(17) (West) (explaining deadly weapon means "firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury"); MD. CODE ANN., CRIM. LAW § 4-101(5)(i) (West) (defining "weapon" as "dirk knife, bowie knife, switchblade knife, star knife, sand club, metal knuckles, razor, and nunchaku"). Because neither party argues that a car is *per se* dangerous, we need not reach the question of whether our statute actually recognizes a *per se* dangerous weapon for the purpose of converting a robbery into an aggravated robbery.

[4] Utah Code section 76-1-601(11) defines "serious bodily injury" as "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death."

apparent when we assign independent meaning to each provision of the aggravated robbery statute defining a "dangerous weapon."

¶26   Reading the aggravated robbery statute together with the statutory language defining a "dangerous weapon" reveals that a defendant must not only use a dangerous weapon but must use it in a way that is "capable of causing death or serious bodily injury." UTAH CODE § 76-1-601(5)(a). Section 76-1-601(5)(b) provides that a dangerous weapon is "a facsimile or representation of the item, if" the actor "leads the victim to reasonably believe the item is likely to cause death or serious bodily injury . . . or . . . represents to the victim . . . that [the perpetrator] is in control of such an item"—regardless of whether the represented item is capable of causing death or serious bodily injury. This section—prohibiting use of a non-dangerous facsimile or representation of a dangerous weapon—would be an unnecessary addition to the statute if a defendant could be convicted of aggravated robbery for using an item capable of causing serious bodily injury in a manner not capable of causing serious bodily injury.

¶27   As explained above, the alternative reading would result in a defendant committing aggravated robbery if, in the course of that robbery, she "used"—even benignly—"an item capable of causing death or serious bodily injury." Consider a robber who holds up a person using a facsimile of a firearm that is incapable of causing serious bodily injury as a firearm, but could cause serious bodily injury if used as a bludgeon. The robber does not use the facsimile firearm as a bludgeon, but she could. If that defendant could be convicted of aggravated robbery based on the potential to use the facsimile firearm as a club, even though she neither uses nor threatens to use it in that fashion, the Legislature would not have needed to add the second subsection, because most if not all facsimiles of weapons could theoretically be used as "an item capable of causing death or serious bodily injury."

¶28   To give meaning to both subsections, we read section 76-1-601(5)(a) to require a defendant to use the dangerous weapon in a way that is "capable of causing death or serious bodily injury." Thus, any object *used in a way* that is "capable of causing death or serious bodily injury," is a "dangerous weapon" for purposes of aggravated robbery. UTAH CODE § 76-6-302(1)(a). Whether in the course of committing a robbery a defendant uses an item in a way that is capable of causing death or serious bodily injury is a question of fact for the jury. *See State v. Childers*, 830 P.2d 50, 55 (Kan. Ct. App. 1991);

*Williams v. State*, 575 S.W.2d 30, 32 (Tex. Crim. App. 1979); *People v. Skelton*, 414 N.E.2d 455, 458 (Ill. 1980).

¶29   We, therefore, must determine whether sufficient evidence shows that Mackin, either in the course of committing a robbery or in the flight after the commission of a robbery, used "any item capable of causing death or serious bodily injury." UTAH CODE §§ 76-6-302(1), (3); 76-1-601(5)(a). Stated differently, if there was evidence before the jury that Mackin (1) drove the car (2) in the commission of or in the flight from the robbery (3) in a manner capable of causing death or serious bodily injury, we should affirm. Because we grant substantial deference to a jury's verdict, we will affirm a jury's finding of fact even if the evidence presented at the district court lends itself to multiple reasonable interpretations. *See State v. Nielsen*, 2014 UT 10, ¶ 30, 326 P.3d 645. And "[c]ontradictory testimony alone is not sufficient to disturb a jury verdict." *State v. Maestas*, 2012 UT 46, ¶ 183, 299 P.3d 892 (alteration in original) (citation omitted). "Nor is it our function to determine guilt or innocence or the credibility of conflicting evidence and the reasonable inferences to be drawn therefrom." *State v. Watts*, 675 P.2d 566, 568 (Utah 1983). We will therefore reverse the jury's verdict "only when the evidence, so viewed, is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he or she was convicted." *Nielsen*, 2014 UT 10, ¶ 30 (citation omitted). Thus, the question for this court "is not whether we can conceive of alternative (innocent) inferences to draw from individual pieces of evidence, or even whether we would have reached the verdict embraced by the jury." *State v. Ashcraft*, 2015 UT 5, ¶ 24, 349 P.3d 664. The question is whether the evidence was so lacking that "no reasonable jury could find the defendant guilty beyond a reasonable doubt." *State v. Robbins*, 2009 UT 23, ¶ 18, 210 P.3d 288.

¶30   Mackin contends that no evidence supports the jury's verdict that he "used his vehicle as a dangerous weapon." He argues that to show he used his car as a dangerous weapon under Utah Code section 76-1-601, the State must demonstrate that he "dr[ove] the car dangerously, perhaps by directing the car . . . so as to hit [Ex-girlfriend] as he fled or trying to run her over."[5] Mackin also

---

[5] We agree with Mackin that these examples demonstrate ways a vehicle might be used as a dangerous weapon in the course of

(continued . . .)

contends that Ex-girlfriend "did not necessarily testify that [he] drove with her hanging out" of the car. He maintains that he "merely had the car in neutral and as they struggled over the purse, he would push in the clutch and the car would roll backwards, with [Ex-girlfriend] walking along and eventually diving in."[6]

¶31 But the evidence supports the jury's verdict. At trial, Mackin reported that Ex-girlfriend dove head first into the car, with half her body hanging out of the window. And both Mackin and Ex-girlfriend testified that he actually drove the vehicle with Ex-girlfriend positioned this way. Ex-girlfriend testified that she "leaned through the passenger window to grab [her] purse . . . and then [Mackin] just proceeded to drive off with me halfway in the car." She also testified, "[a]t first he wasn't going very fast at all because he had just started driving and then the more we argued while he was driving, and the more I tried to grab my purse the faster he [went]." Mackin himself testified that he was "backing out" from behind the motor home when Ex-girlfriend "dove into the window," and that he did a three-point turn and "proceeded forward" with Ex-girlfriend still hanging out the window. Later, when Mackin described the fight over the purse—including both before and after Ex-girlfriend gained full entry into the vehicle—he testified, "[y]eah, I was driving." But the most damning evidence came when the prosecutor asked Mackin on cross-examination, "[d]id you continue

---

committing a robbery. But these are not the only ways. The statutory inquiry focuses on whether the defendant used or threatened to use the dangerous weapon in a manner capable of causing death or serious bodily injury in the course of the robbery and does not require a jury to consider whether the robber actually needed to use the dangerous weapon to rob the victim.

[6] We note that Mackin failed to marshal all of the evidence that supports the jury's verdict. While that does not foreclose his claim, it is difficult to persuade us that a lack of evidence supports his conviction by only discussing the evidence that supports his argument. *See State v. Nielsen*, 2014 UT 10, ¶ 42, 326 P.3d 645 (holding that "a party challenging a factual finding or sufficiency of the evidence to support a verdict will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal" the evidence supporting a challenged factual finding).

to operate your vehicle while she was halfway inside of your vehicle and trying to get her purse back?" He responded, "[u]mmm, yes, I continued to drive the vehicle." And after the prosecutor asked how far Mackin drove with Ex-girlfriend positioned that way, Mackin confessed, "I tried to get to as many people as I could, as fast as I could so I drove to the busiest street in [the city]."[7]

¶32 While Mackin provided no details regarding how long or how fast he drove with Ex-girlfriend hanging out the window, Ex-girlfriend did. She stated that his speed reached "maybe 25, not even 25 miles per hour." She also stated that he drove the car halfway down the street before she pulled her body into the car. Mackin's own testimony, recounted above, also defeats his claim that no evidence demonstrates he actually drove his car while Ex-girlfriend was hanging out the window. And while Mackin contends that he "merely had the car in neutral . . . as they struggled over the purse," as we stated above, "[c]ontradictory testimony alone is not sufficient to disturb a jury verdict." *Maestas*, 2012 UT 46, ¶ 183 (alteration in original) (citation omitted). Evidence before the jury indicated that Mackin drove his vehicle while Ex-girlfriend was hanging out of it, and that he did so while fighting Ex-girlfriend for possession of the purse. This evidence supports a reasonable inference that the vehicle, as used, was capable of causing serious bodily injury or death. *See* UTAH CODE § 76-1-601(5)(a). In other words, sufficient evidence supports the jury's conclusion that Mackin committed an aggravated robbery.

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DECLINING TO GRANT MACKIN A CONTINUANCE

¶33 Mackin also contends that the district court abused its discretion when it refused to grant him a "continuance to secure the attendance of witnesses critical to his defense." "It is well established in Utah, as elsewhere, that the granting of a continuance is at the discretion of the trial judge, whose decision will not be reversed by this Court absent a clear abuse of that discretion." *State v. Creviston*, 646 P.2d 750, 752 (Utah 1982). A district court abuses its discretion

---

[7] Moreover, the jury heard testimony that Mackin was operating the vehicle after consuming methamphetamine and was engaged in a violent struggle with Ex-girlfriend over her purse while driving.

when it "denies a continuance and the resulting prejudice affects the substantial rights of the defendant, such that 'a review of the record persuades the court that without the error there was a "reasonable likelihood of a more favorable result for the defendant."'" *State v. Taylor*, 2005 UT 40, ¶ 8, 116 P.3d 360 (citation omitted). When a defendant moves for a continuance to procure "the testimony of an absent witness, [he or she] must show that the testimony sought is material and admissible, that the witness could actually be produced, that the witness could be produced within a reasonable time, and that due diligence has been exercised before the request for a continuance." *Creviston*, 646 P.2d at 752. A failure to establish even one aspect of the above test defeats Mackin's claim.

¶34 To establish that the witnesses he wanted to call would have provided testimony material to his defense, Mackin must demonstrate with a reasonable probability that the nonadmitted evidence "would affect the outcome of the criminal proceeding." *See State v. Bakalov*, 1999 UT 45, ¶ 45, 979 P.2d 799; *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 868 (1982). Mackin contends that the witnesses' testimony is "key" because it would have allowed him to establish a defense to robbery: that he "found evidence of a crime . . . and attempted to take it, and to report the violations to the police" under the citizen's arrest statute. But the citizen's arrest statute would not have provided Mackin with a defense here and, thus, would not have affected the outcome of his case.[8]

---

[8] Mackin also claims these witnesses would have corroborated an "honest belief" defense and an "attempting to report" defense, as well as a defense that the property did not belong to Ex-girlfriend and, thus, he could not have robbed her of it. Mackin raised these arguments for the first time in his reply brief. He also fails to provide us with a "citation to the record showing that the issue was preserved in the trial court" or "a statement of grounds for seeking review of an issue not preserved in the trial court." UTAH R. APP. P. 24(a)(5)(A), (B). And, despite looking, we cannot find them. In the interests of fairness, we do not address arguments omitted from an appellant's opening brief. *See supra* ¶ 20 n.2; *infra* ¶ 38 n.9. We, therefore, address only his argument that the citizen's arrest defense would have exonerated him.

¶35 The citizen's arrest statute provides that "[a] private person may arrest another: (1) For a public offense committed or attempted in his presence; or (2) When a felony has been committed and he has reasonable cause to believe the person arrested has committed it." UTAH CODE § 77-7-3. An arrest is defined as "an actual restraint of the person arrested or submission to custody." *Id.* § 77-7-1. And Utah law requires that "[t]he person [arrested] . . . not be subjected to any more restraint than is necessary for his arrest and detention." *Id.* Moreover, a person making a citizen's arrest must ordinarily "inform the person being arrested of his intention, cause, and authority to arrest him." *Id.* § 77-7-6(1).

¶36 The citizen's arrest statute does not provide Mackin with a defense to his robbery charge. Mackin did not arrest or otherwise attempt to restrain Ex-girlfriend before he robbed her. He did not provide notice to Ex-girlfriend that he intended to arrest her to prevent a theft of a motor home in accordance with the Utah Code. The citizen's arrest statute provides that a citizen may detain another citizen for a short period of time to facilitate the official arrest of that person. *See McFarland v. Skaggs Cos.*, 678 P.2d 298, 301 (Utah 1984) ("In the case of a lawful arrest without a warrant, the person making the arrest must present the prisoner promptly before a magistrate. An unreasonable delay in this respect will constitute an abuse of the privilege and will render the actor liable for that portion of the imprisonment which is in excess of the reasonable period allowed for such presentment." (citation omitted)). It does not provide that a citizen may commit robbery to obtain evidence of another person's crime—even if that citizen honestly desires to take the alleged evidence to the police. It also does not provide that a citizen may commit a robbery to thwart another's felony.

¶37 Because Mackin did not attempt to perform a citizen's arrest of Ex-girlfriend, Mackin could not have defeated his robbery charges with a citizen's arrest defense. Therefore, the witnesses Mackin wanted to call to bolster that defense would have provided testimony—even assuming they would have testified as Mackin now claims—that would not have been material to his case. *See Creviston*, 646 P.2d at 752. And because the witnesses' testimonies would not have been material to his case, we cannot see "a reasonable likelihood of a more favorable result" for Mackin. *Taylor*, 2005 UT 40, ¶ 8 (citation omitted). The district court, therefore, did not abuse its discretion in denying Mackin's request for a continuance in an

attempt to secure testimony related to an inapplicable citizen's arrest defense.[9]

## III. THE DISTRICT COURT DID NOT VIOLATE MACKIN'S CONFRONTATION RIGHTS BY ADMITTING EX-GIRLFRIEND'S PRELIMINARY HEARING TESTIMONY

¶38 Mackin also argues that the district court abused its discretion because its failure to grant his continuance to secure Ex-girlfriend's presence at trial resulted in a violation of his Sixth Amendment confrontation rights.[10] The Sixth Amendment to the

---

[9] Mackin also urges us to grant a motion to remand under rule 23B of the Utah Rules of Appellate Procedure. *See* UTAH R. APP. P. 23B(a). Mackin's motion asks this court for a chance to develop the testimony he believes he could have presented at trial pertaining to his various undeveloped defenses. A rule 23B remand "shall be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." *Id.* Mackin's rule 23B motion attaches preliminary hearing testimony the witnesses provided in a related case but does not explain how he was prejudiced by the failure to introduce testimony like this at trial. Mackin merely refers us to the addenda of his motion and to his "opening brief," which in turn refers us back to his rule 23B motion. Because Mackin fails to identify the testimony he believes would support his claim and to analyze the facts of his case in conjunction with current law, we do not have the record before us — or sufficiently developed argument permitting us — to evaluate the strength of Mackin's claim. Furthermore, Mackin has not convinced us that the information developed on remand is material to his case. *See supra* ¶¶ 33–37.

[10] Mackin raises only a federal constitutional claim. We therefore do not address any claim he could have raised under his state constitutional rights. *Midvale City Corp. v. Haltom*, 2003 UT 26, ¶¶ 74–75, 73 P.3d 334 ("For the court to consider a state constitutional claim, a litigant must at least define the nature of that protection and provide some argument as to how legal precedent supports its position. Without analysis, the court can make no informed decision regarding whether the state constitutional provision in question was intended to mirror its federal counterpart, or whether it was

(continued . . .)

United States Constitution enshrines a criminal defendant's right "to be confronted with the witnesses against" her. U.S. CONST. amend. VI. While the Sixth Amendment's plain text "does not suggest any open-ended exceptions," the United States Supreme Court held in *Crawford v. Washington* that the Sixth Amendment incorporates an exception to the confrontation requirement "established at the time of the founding." 541 U.S. 36, 54. Consequently, under *Crawford,* a declarant's pretrial testimonial statement satisfies the confrontation clause if (1) the declarant is "unavailable" at trial and (2) the defendant had a "prior opportunity" to cross-examine the declarant about the admitted statement. *Id.* at 59.

¶39   Consistent with the Supreme Court's ruling in *Crawford*, the Utah Court of Appeals held in *State v. Garrido* that an unavailable witness's preliminary hearing testimony was admissible even though trial counsel did not question the witness at the preliminary hearing, because the defendant had a prior opportunity to cross-examine the witness. 2013 UT App 245, ¶ 20, 314 P.3d 1014, *cert. denied*, 320 P.3d 676 (Utah 2014). That court concluded that "it was the opportunity to cross-examine [the witness], not the actual undertaking of cross-examination, that satisfied the requirements of *Crawford*." *Id. Garrido* also aligns with this court's prior ruling in *State v. Menzies*, 889 P.2d 393 (Utah 1994), which explains that "[t]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Id.* at 403 (citation omitted); *see also United States v. Owens*, 484 U.S. 554, 559 (1988).

¶40   Mackin does not argue the State failed to prove that Ex-girlfriend was unavailable. Nor does he precisely argue that he did not have a prior opportunity to cross-examine her. Instead, he argues that "conflicts with his counsel . . . at the preliminary hearing" prevented him from exercising his confrontation rights to the extent that he would have liked and that the district court abused its discretion in not delaying the trial so he could locate Ex-girlfriend to cross-examine her on those areas not adequately explored at the preliminary hearing. Mackin does not, however, explain what

---

intended to expand the scope of [the federal constitution's] guarantees." (citation omitted)).

additional questions he would have asked. Nor does Mackin detail what Ex-girlfriend would have said had the court granted the continuance. Instead, Mackin avers that "[t]he record is not adequately developed as to the nature of the questions which were not asked of [Ex-girlfriend] or what evidence [he] was unable to secure because [Ex-girlfriend] did not appear." Mackin concedes that "the record does not reflect what these questions would have been" and asks for a rule 23B remand to develop this record.[11]

¶41   As previously noted, this is not how Utah Rule of Appellate Procedure 23B is designed to function. *See supra* ¶ 37 n.9. Rule 23B requires a party to perform the factual investigation before asking this court for a remand. *See, e.g.*, *State v. Garrett*, 849 P.2d 578, 581 (Utah Ct. App. 1993) ("Given [rule 23B's] clear emphasis on specific factual allegations, it would be improper to remand a claim under rule 23B for a fishing expedition."). The movant must put forward a "nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." UTAH R. APP. P. 23B(a). The motion must also include or attach affidavits that allege the facts not appearing in the record and that "show the claimed prejudice suffered by the appellant as a result of the claimed deficient performance." *Id.* R. 23B(b). Mackin has not provided us with affidavits detailing the conflict he and trial counsel had or explained how that conflict impacted counsel's performance at the pretrial hearing. He further fails to show how by not asking the questions he would have asked in hindsight, counsel provided ineffective assistance. As we stated above, despite Mackin's claim that this information would "exonerate" him, the citizen's arrest defense he raises does not apply to his charges of robbery or aggravated robbery and is therefore not material to his case. *See supra* ¶¶ 34–37. Thus, we do not have before us either nonspeculative facts showing counsel's ineffective

_____

[11] Although Mackin does not cite *Strickland v. Washington,* or any other ineffective assistance of counsel case, his request for a rule 23B remand suggests that he rests his claim on ineffective assistance. He does not explicitly connect the dots in this argument but appears to argue that trial counsel's ineffective assistance at the preliminary hearing put him in a hole that he could not climb out of after the district court allowed Ex-girlfriend's preliminary hearing testimony to be read at trial.

performance or facts showing that counsel's ineffective performance—even if assumed—harmed Mackin in any way. We, therefore, decline to grant Mackin's rule 23B motion to remand as to Ex-girlfriend.

¶42 Mackin's confrontation rights were not violated when the district court allowed the jury to hear unavailable Ex-girlfriend's preliminary hearing testimony.[12] Accordingly, the trial court did not abuse its discretion in declining Mackin a continuance to secure Ex-girlfriend's attendance at his trial.

## CONCLUSION

¶43 The district court did not err in declining to reduce Mackin's aggravated robbery charge to robbery because sufficient record evidence supports Mackin's aggravated robbery conviction. Nor did the district court abuse its discretion in declining to grant Mackin's request for a continuance to secure the attendance of additional defense witnesses and Ex-girlfriend. We affirm Mackin's convictions and sentence.

---

[12] Mackin also argues that the district court erred in permitting Ex-girlfriend's preliminary hearing testimony to be read at trial from an unofficial and uncertified transcript prepared by his defense team. Mackin did not preserve an objection to the use of the unofficial transcript in a way that presented the district court an opportunity to rule on it. *See Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828 ("An issue is preserved for appeal when it has been 'presented to the district court in such a way that the court has an opportunity to rule on [it].'" (alteration in original) (citation omitted)). Generally, we will not consider an issue on appeal unless it has been preserved. *Id*. Mackin does not acknowledge this or argue an exception to the preservation requirement. *See id*. ¶ 13. But even if Mackin had preserved the issue, he does not argue that the transcript was inaccurate or aver that he suffered any prejudice because the court permitted the use of an uncertified transcription.