**2021 UT App 112**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
DYLAN HURWITZ,
Appellant.

Opinion
No. 20200657-CA
Filed October 28, 2021

Fourth District Court, Provo Department
The Honorable Thomas Low
No. 191403833

Emily Adams, Attorney for Appellant

Sean D. Reyes and Emily Sopp,
Attorneys for Appellee

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES
GREGORY K. ORME and DAVID N. MORTENSEN concurred.

HARRIS, Judge:

¶1     During the COVID-19 pandemic, Utah courts have been
required to conduct most of their hearings and proceedings
remotely, through online videoconferencing platforms. In this
case, the district court conducted Dylan Hurwitz's sentencing
hearing via videoconference, with the participants dialing in
from several different locations. Hurwitz participated from the
county jail, where he was located in a room that did not lend
itself well to a clear audio connection. The central question in
this case is whether Hurwitz's personal statement, offered
remotely from that room at the jail, could adequately be heard
by the district court and the other participants at the hearing.

¶2      At the conclusion of the sentencing hearing, the district court sentenced Hurwitz to prison on seven felonies—including burglary and theft—to which he had pled guilty. Hurwitz now appeals that sentence, claiming that he was not afforded an adequate opportunity to allocute; in particular, he asserts that his sentence was therefore illegal under rule 22(e) of the Utah Rules of Criminal Procedure, and that his attorney rendered ineffective assistance by not objecting to the poor audio quality of his statement. After listening to the audio recording of the sentencing hearing—which was made part of the appellate record in this case—we conclude that Hurwitz's statement was sufficiently intelligible, and largely on that basis we reject Hurwitz's arguments and affirm his sentence.

BACKGROUND

¶3      Over the course of the summer of 2019, Hurwitz and a friend broke into and stole from several local small businesses. They were eventually caught, but not before they caused nearly $200,000 worth of damage—both in terms of stolen items and property damage—to the businesses. The State charged Hurwitz with more than twenty crimes in five separate cases; the charges ranged from aggravated burglary to criminal mischief. Hurwitz entered into a plea agreement with the State: he agreed to plead guilty to seven felonies—including three second-degree counts of theft and three third-degree counts of burglary—and the State agreed to dismiss the remaining charges. After Hurwitz entered his pleas, the court scheduled a sentencing hearing.

¶4      Over the next month, Adult Probation and Parole (AP&P) prepared a presentence report (PSR) for the court's benefit at sentencing. Included in the PSR was a personal statement from Hurwitz, in which he expressed that he felt "terrible" about the crimes he committed, that he was newly motivated to change his life for the benefit of his fiancée and young daughter, and that he wanted to remain out of custody and on probation so that he

could begin to pay restitution to the burglary and theft victims. AP&P recommended that Hurwitz be afforded the opportunity for probation, rather than be sent to prison, contingent on Hurwitz serving a short jail sentence and paying restitution.

¶5     The sentencing hearing was not held in person because of health concerns related to the worldwide COVID-19 pandemic. Instead, the district court conducted the sentencing hearing over an online videoconferencing platform. The court conducted the hearing from chambers, and all the other participants joined the hearing via video from other locations. Hurwitz participated in the hearing from a room at the county jail. No live court reporter was present; instead, the hearing was recorded through videoconferencing software, and that recording could later be used to create a transcript of the proceedings, if necessary.

¶6     At the beginning of the hearing, Hurwitz's attorney (Counsel) addressed the court, and asked it to follow AP&P's recommendation, emphasizing Hurwitz's remorse and his eagerness to get to work so that he could start paying restitution. Counsel also directed the court's attention to several letters that had been submitted in support of Hurwitz, from family and friends, attesting to Hurwitz's character and willingness to make the situation right. The court then heard statements from Hurwitz's mother, father, and fiancée, all of whom likewise spoke of Hurwitz's remorse, willingness to change, and willingness to pay restitution. Hurwitz's fiancée, in particular, emphasized that Hurwitz was willing to change his ways due to the recent birth of their infant daughter.

¶7     The State then addressed the court, and asked it to sentence Hurwitz to prison. The State noted that Hurwitz had not been successful on probation in the past, and argued that Hurwitz was "not a good candidate for probation" and was a danger to society. The State also directed the court's attention to impact statements that had been submitted by three of the burglary victims.

¶8    Up until that point in the sentencing hearing, the audio quality of the videoconference appears to have been excellent, with all participants able to hear one another; the official transcript of the proceeding up to that point contains no indication of any audio difficulties.

¶9    The court then provided Hurwitz with the opportunity to speak on his own behalf. But due to the conditions in the room at the jail where Hurwitz was located—including perhaps the distance between Hurwitz and the microphone—Hurwitz's words were apparently more difficult to hear and understand than the other participants' had been. At the outset of Hurwitz's remarks, the court noted that Hurwitz's voice was "echoey" and asked Hurwitz to move closer to the microphone if possible. Indeed, the certified court transcriber later noted in the transcript that she "was unable to hear and understand [Hurwitz] due to a very muffled record." Apparently due to the transcriber's inability to understand Hurwitz's words on the recording, the official transcript of Hurwitz's statement is riddled with the notation "(inaudible)."[1] As a result, when one reviews the transcript of Hurwitz's statement, it is difficult to make out even the general gist of what he said to the court.

¶10    But despite the "echoey" nature of Hurwitz's remarks, neither the court nor Counsel interrupted Hurwitz's statement (at least not after the initial request to move closer to the microphone) and no participant in the hearing made any objection, in the moment, that they could not hear and understand Hurwitz's remarks. Indeed, in comments made immediately after Hurwitz finished speaking, the court gave some indication that it was able to understand Hurwitz's presentation, commenting to Hurwitz that "it's good to see that you acknowledge that you've compromised a lot of people."

---

1. Attached to this opinion as Addendum A is a copy of the official transcript of Hurwitz's statement.

¶11 At the conclusion of the hearing, the court sentenced Hurwitz to prison, with some (but not all) of the sentences to run consecutively to the others. In addition, the court imposed a fine and ordered Hurwitz to pay restitution. The court acknowledged that Hurwitz was said to be "a devoted father" and "very intelligent and very employable," but in the court's view the "offenses were characterized by extreme depravity" and "excessive property damage," and the victims sustained "substantial psychological injuries." The court observed that previous incarceration had not "had any deterrent effect on [Hurwitz's] behavior," and offered its view that prison was the only option left "to incapacitate [Hurwitz] and make a period of time for the community when we're safe from his actions and he's no longer terrorizing local businesses." The court explained that, among other things, the sentence was intended to "make sure that there was a very heavy consequence for future violations of parole," and to allow parole officials to keep Hurwitz incarcerated for "decades" if necessary.

¶12 After Hurwitz appealed his sentence and noted the unintelligible transcript, the parties agreed to supplement the appellate record by including the raw audio recording. We note the unusual nature of this stipulation: in nearly all instances, the official appellate record of what happened at a court hearing is the certified court transcriber's transcript of the proceedings, not the audio recording of the proceedings. *See* Utah R. App. P. 11(a). But now that the audio recording has been made part of the appellate record by stipulation, we have taken the opportunity to listen to that recording, and (as discussed below) we are able to understand nearly everything Hurwitz said during his sentencing statement.[2] He expressed remorse to the

---

2. Attached to this opinion as Addendum B is a copy of a reconstituted transcript of Hurwitz's statement, based on our own review of the audio recording.

court for his actions and apologized vigorously to the victims of his crimes. He discussed his family, including his infant daughter, and indicated a desire to do better by his fiancée and daughter, as well as a desire to work to support them financially. He informed the court that he had already secured steady employment and that he was able to begin paying restitution. He also asked the court for mercy and to be afforded the opportunity of probation once again.

ISSUES AND STANDARDS OF REVIEW

¶13　Hurwitz appeals his sentence, and raises two separate challenges for our review. First, he asserts that his right of allocution was violated, and contends that he is therefore entitled to a correction of sentence pursuant to rule 22 of the Utah Rules of Criminal Procedure. Whether a sentence is subject to correction under rule 22 presents a question of law "which we review for correctness, granting no particular deference to the conclusions of the [district] court." *See State v. Kelson*, 2015 UT App 91, ¶ 5, 348 P.3d 373 (quotation simplified). Second, Hurwitz claims that Counsel rendered constitutionally ineffective assistance when he did not ensure that Hurwitz's statement was intelligible to the court during sentencing.[3]

---

3. In addition to his two main challenges, Hurwitz has also filed a motion, pursuant to rule 23B of the Utah Rules of Appellate Procedure, asking us to remand the case to the district court for further findings necessary to a determination of his ineffective assistance of counsel claim, including potential findings that his statement at the sentencing hearing was unintelligible and that Counsel was aware of this fact. But because we determine, based on the existing supplemented record, that Hurwitz's statement was not unintelligible, we can readily adjudicate Hurwitz's ineffective assistance claim without the necessity of remand, and on that basis we deny Hurwitz's rule 23B motion.

"When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (quotation simplified).

## ANALYSIS

### I

¶14 Hurwitz first asserts that he is entitled to relief under rule 22(e) of the Utah Rules of Criminal Procedure because "his sentence was imposed in an illegal manner when he was not able to speak in an intelligible manner at his sentencing hearing." In support of his argument, Hurwitz cites cases decided under a previous version of rule 22(e). *See, e.g.*, *State v. Udy*, 2012 UT App 244, ¶ 26, 286 P.3d 345 (explaining that, under the former version of the rule, if a defendant's right to allocution had been denied, the sentence "was imposed in an illegal manner and [could] be challenged at any time" (quotation simplified)). But under the current version of rule 22(e), Hurwitz's argument fails.

¶15 As an initial matter, we reject the argument, implied in Hurwitz's briefing, that the previous version of rule 22(e) applies to his case. The current version of the rule went into effect in 2017, well before Hurwitz (in 2019) committed the burglaries and thefts that form the basis for his prosecution here. Courts apply the version of the rule that was in effect at the time of the event or occurrence being regulated, *see State v. Clark*, 2011 UT 23, ¶ 11, 251 P.3d 829, and—regardless whether that occurrence is the underlying crime or the imposition of sentence—that principle of law dictates that the post-2017 version of rule 22(e) applies here, *see State v. Wilkerson*, 2020 UT App 160, ¶¶ 23–24, 478 P.3d 1048 (refusing to apply the previous version of rule 22(e) in a case in which all relevant events occurred after the 2017 amendment).

¶16    Prior to the 2017 amendment, subsection (e) of rule 22—which rule sets forth procedures governing the sentencing of criminal defendants—contained "sweeping" language that allowed a court to "correct an illegal sentence, or a sentence imposed in an illegal manner, at any time." *See State v. Candedo*, 2010 UT 32, ¶ 9, 232 P.3d 1008 (quotation simplified); *see also* Utah R. Crim. P. 22(e) (2016). In 2017, however, subsection (e) was amended to remove that sweeping language and to replace it "with more limiting provisions authorizing a court to 'correct a sentence' only when the 'sentence imposed' met any one of six specific conditions." *See Wilkerson*, 2020 UT App 160, ¶ 24 (quoting Utah R. Crim. P. 22(e)(1) (2018)). Hurwitz's claim fails under the new version of the rule because his claim does not implicate any of the six conditions.[4]

---

4. The State asserts that Hurwitz's rule 22(e) claim fails for a second reason: because Hurwitz did not file a motion invoking that rule with the district court. Under the State's interpretation, the new version of the rule—as opposed to the pre-2017 version, which was considered a "limited exception to the preservation doctrine" that allowed "an appellate court to vacate an illegal sentence even if the legality of the sentence was never raised in proceedings below," *see State v. Houston*, 2015 UT 40, ¶¶ 18–20, 353 P.3d 55 (quotation simplified)—requires the matter to be first raised before the district court in order to be properly presented for appellate review. Given the new rule's incorporation of a requirement for the filing of "a motion" within a certain time frame, we think the State has raised an interesting issue that would be worth exploring in an appropriate case. *See* Utah R. Crim. P. 22(e)(3). As far as we are aware, no Utah appellate court has yet—at least not in a published opinion—squarely addressed whether the new version of rule 22(e), like its predecessor, includes an exception to the customary preservation rules. We need not address this issue here, however, because Hurwitz's

(continued…)

¶17　Hurwitz makes no argument under five of the six subsections set forth in rule 22(e)(1). But Hurwitz argues that his sentence falls within the condition outlined in subsection (e)(1)(F), which requires a court to correct a sentence if it "omits a condition required by statute." As Hurwitz sees it, that subsection applies here, because rule 22 affords him "an opportunity to make a statement" at the sentencing hearing, which opportunity he asserts was denied him due to the audio difficulties experienced at the hearing. *See* Utah R. Crim. P. 22(a).

¶18　As we explain below, Hurwitz was not denied an opportunity to make a statement to the court at the sentencing hearing. *See infra* Part II. But even if he had been, that denial would not have resulted in his actual sentence—imposed *after* the sentencing hearing—omitting any condition required by statute or rule. As we interpret subsection (e)(1)(F), that provision concerns the substance of the punishments to which a defendant is sentenced (e.g., jail or prison time, fines, restitution, conditions of probation), and not the procedures observed by a court during a sentencing hearing. Hurwitz makes no assertion that any provision of his actual sentence—e.g., his prison term, his fine, or his restitution amount—omits any condition required by statute. A defendant whose right to allocution was impaired may, in appropriate cases, be entitled to relief under rule 22(a), but not under subsection (e)(1)(F), which has no application here.

¶19　On this basis, we reject Hurwitz's request for correction of sentence under rule 22(e).

---

(…continued)
rule 22(e) claim fails on another ground. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 (explaining that, in the interest of judicial economy, "if the merits of a claim can easily be resolved *in favor of the party asserting that the claim was not preserved*, we readily may opt to do so without addressing preservation").

II

¶20 Next, Hurwitz claims that Counsel rendered ineffective assistance by failing to ensure that Hurwitz's sentencing statement was audible and intelligible. We reject this argument, because our analysis of the record reveals that the court was able to hear Hurwitz well enough, and that Counsel did not perform deficiently by failing to flag the issue during the hearing.

¶21 To prove ineffective assistance of counsel, Hurwitz must demonstrate both that Counsel's "performance was deficient," and that this deficient performance prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). "Because both prongs of the *Strickland* test must be met to establish ineffective assistance of counsel," we need not address both prongs if a defendant's claim clearly fails on one of them. *See State v. Fleming*, 2019 UT App 181, ¶ 9, 454 P.3d 862 (quotation simplified); *see also Strickland*, 466 U.S. at 697 (stating that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one"). In this case, Hurwitz cannot demonstrate that Counsel rendered deficient performance, and we therefore limit our discussion largely to that component of the inquiry.[5]

¶22 In assessing whether Counsel's performance was deficient, we apply "the deficiency standard announced in *Strickland*" and ask whether Counsel's actions "fell below an objective standard of reasonableness." *See State v. Scott*, 2020 UT

---

5. We note, however, that Hurwitz's ineffective assistance claim is just as infirm on the prejudice prong as it is on the deficient performance prong. Because the court was able to hear Hurwitz's statement well enough, there is no reasonable likelihood that an objection by Counsel would have changed the outcome of the sentencing hearing.

13, ¶ 31, 462 P.3d 350 (quotation simplified); *see also Archuleta v. Galetka*, 2011 UT 73, ¶ 38, 267 P.3d 232 ("To prevail, a defendant must show . . . that his counsel rendered a deficient performance in some demonstrable manner," and that counsel's "performance fell below an objective standard of reasonable professional judgment." (quotation simplified)). In evaluating an attorney's performance, we give that attorney "wide latitude in making tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *State v. Crosby*, 927 P.2d 638, 644 (Utah 1996). Thus, for Hurwitz to meet his burden of demonstrating deficient performance, he must show that Counsel acted in an objectively unreasonable manner by failing to alert the court to potential audio problems with Hurwitz's statement.

¶23 If Hurwitz could show—perhaps with the aid of an unreadable transcript, combined with other evidence—that the statement he offered to the sentencing court was in fact unintelligible, he might well be able to demonstrate that Counsel performed deficiently by not flagging the issue during the hearing. A defendant's right to allocution "is both a constitutional and statutory right," *see State v. Kelson*, 2015 UT App 91, ¶ 6, 348 P.3d 373 (quotation simplified), and that right includes the opportunity to "make a statement" to the court at sentencing, *see* Utah R. Crim. P. 22(a); *see also State v. Wanosik*, 2003 UT 46, ¶ 19, 79 P.3d 937 (stating that "one purpose of the right to allocute is to provide the defendant personally with an opportunity to address the court"). We agree with Hurwitz that a right to make a statement to the court would be rendered meaningless if the right could be satisfied by the defendant offering a statement that the court was unable to hear or understand.

¶24 But that is not what happened here. Notwithstanding the state of the transcript, Hurwitz's statement was audible and intelligible to the court, and we know this because the actual audio recording of the sentencing hearing was made part of the

appellate record by stipulation. We have listened to the recording of Hurwitz's statement, and have ascertained for ourselves that Hurwitz's words were nowhere near as unintelligible as the original transcript makes them out to be. *Compare* Addendum B, *with* Addendum A. While the quality of the audio is not ideal, nearly all of Hurwitz's words are audible and intelligible. One can hear Hurwitz express remorse for his actions, and apologize to the victims of his crimes. One can hear his discussion of his family, especially his fiancée and infant daughter, and one can hear him express his desire to do better by them and support them emotionally and financially. One can hear him inform the court of his desire to pay restitution, and that he had already secured steady employment to facilitate those payments. And one can hear Hurwitz ask the court for mercy, and to be afforded one more opportunity for probation.

¶25    When one realizes that nearly all of Hurwitz's words were audible and intelligible, and that the message Hurwitz was trying to convey to the court came through with sufficient clarity, Counsel's decision not to raise any objection to the quality of the audio comes into focus. After listening to the recording, we can certainly understand why a reasonable attorney would feel no need to object. And this conclusion is further supported by the district court's own behavior. At the outset of Hurwitz's statement, the court noted the "echoey" nature of Hurwitz's audio, and invited Hurwitz to move closer to the microphone, but gave no further indication that it could not hear and understand the statement Hurwitz offered. Indeed, after Hurwitz finished talking, the court made comments indicating that it had been able to understand Hurwitz's presentation, telling Hurwitz that it was "good to see that you acknowledge that you've compromised a lot of people." A reasonable attorney, after listening to Hurwitz's statement and the court's post-statement comments, could very well have determined that the court was able to hear Hurwitz's statement well enough and that no objection was necessary.

¶26 On this record—which includes the actual audio recording of the sentencing hearing—Hurwitz cannot demonstrate that Counsel performed deficiently by not objecting to the intelligibility of Hurwitz's sentencing statement. Accordingly, Hurwitz cannot demonstrate that Counsel rendered constitutionally ineffective assistance.

III

¶27 Although we have disposed of both of Hurwitz's appellate arguments, we take this opportunity to comment on some of the issues brought to the fore by the circumstances of this case. This is one of the first "unintelligible transcript" cases from the COVID-19 era to reach the appellate courts, but we anticipate that it will not be the last. We therefore offer some words of caution and advice to attorneys, courts, court staff, and certified transcribers, in an effort to perhaps improve the quality of transcripts before they reach us, and to perhaps lessen procedural frustration in future similar cases.

¶28 We encourage courts, attorneys, and court staff to speak up, in the moment, if they perceive any doubt about whether a person addressing a court can adequately be heard. Such issues are always easier to remedy if they are caught while the hearing is still going on. Courts should get in the habit, if they are not already, of periodically checking on the audio quality of ongoing hearings. And attorneys and court staff should not hesitate to raise such issues to the court, even at the risk of interrupting another speaker, if they perceive a potential problem.

¶29 We also note the importance of providing certified transcribers—who, as noted, in our system are usually not present at the time the hearing occurs and are nearly always asked to create a transcript, after the fact, from an audio recording—with the highest quality recording possible. To the extent there exist ways to improve the quality of the recordings

ultimately provided to transcribers, we encourage exploration of those avenues.

¶30 Next, we emphasize to transcribers the duty to carefully listen to audio recordings, more than once if necessary, to glean from those recordings the maximum possible number of words. We recognize that the audio quality of recordings—and even of different witnesses within the same recording—will vary, and we acknowledge that creating a transcript from an audio recording is an inherently difficult and detailed task. We also acknowledge the possibility that the quality of the audio recording provided to the transcriber in this case was not as good as the quality of the audio recording placed in the appellate record. But we cannot overemphasize the importance to our judicial system of having an accurate transcript of court proceedings, including those proceedings that take place remotely via videoconference.

¶31 Finally, we note the unusual nature of the procedure invoked by the parties in this case. Ordinarily, the certified transcript of court proceedings constitutes the official appellate record of those proceedings. *See* Utah R. App. P. 11(a) ("The original papers and exhibits filed in the trial court, including . . . the transcript of proceedings, if any, . . . shall constitute the record on appeal in all cases."). It is a highly unusual step for the actual audio recording of a court hearing to be made part of the appellate record, whether by stipulation or otherwise. Our appellate rules provide an avenue for parties to use in cases where one party believes that the official transcript does not accurately reflect the words spoken at a hearing. Those rules state as follows:

> If any difference arises as to whether the record truly discloses what occurred in the trial court, the difference shall be submitted to and settled by that court and the record made to conform to the truth.

*Id.* R. 11(h). That same subsection allows the appellate court to answer "[a]ll other questions as to the form and content of the record," and to grant motions to supplement the record. *Id.* But it is ordinarily not our task to listen to audio recordings of trial court proceedings and determine whether the content of those recordings matches the official transcript of the proceeding prepared by the certified transcriber. Such work is, by design and by rule, to be done by trial courts, whose task it is to find facts when those facts are called into dispute.

¶32   Nevertheless, in this case we went ahead and listened to the audio recording made available to us, and drew our own conclusions about the intelligibility of the statement Hurwitz made at the sentencing hearing. We did this for four reasons. First, no party asked us to do otherwise; indeed, the parties stipulated to the supplementation of the appellate record to include the audio recording, thereby expressing a mutual desire for us to listen to that recording and compare it to the transcript. Second, the disputed portion of the transcript was relatively short, comprising approximately three pages. Third, this case is the first "unintelligible transcript" case to reach us in the COVID-19 era, and we wished to issue some guidance for bench and bar. Finally, and most importantly, the issue raised here was whether Counsel rendered ineffective assistance, and to resolve that issue we did not need to necessarily find facts regarding exactly what Hurwitz said at the hearing; rather, we simply needed to ascertain whether the recording was intelligible enough for a reasonable attorney to have forgone an objection under the circumstances.

¶33   Thus, this is an exceptional case. We caution attorneys that, in most cases, we will be far less willing to listen to an audio recording to resolve a dispute regarding the accuracy of the transcript. Such matters are ordinarily to be resolved by trial courts pursuant to rule 11(h).

¶34 We do not know how long this pandemic will last, but in any event we can envision our trial courts conducting at least some hearings via videoconference for quite some time to come. It is important that attorneys, courts, court staff, and certified transcribers do all that they can to ensure accuracy and intelligibility in audio recordings and transcripts, and for attorneys to follow rule 11(h) when an accuracy issue arises.

## CONCLUSION

¶35 We reject Hurwitz's assertion that his sentence requires correction under rule 22(e). And because the statement Hurwitz made at the sentencing hearing was audible and intelligible, Counsel did not render ineffective assistance by forgoing an objection. We therefore affirm Hurwitz's sentence.

———————

# Addendum A

# Hurwitz Sentencing Hearing

# Original Transcript

(with redactions for privacy purposes)

a good son and a good friend and try to be a good father and still be dangerous to society. And he's demonstrated that over the last 13 years in the history (inaudible).

So we'd ask the Court to deviate from the PSI and order that he serve prison on these cases concurrent.

THE COURT: All right. Thank you, Mr. Kinnerley. Mr. Parmley, do you want to say anything else before you turn time over to your client?

MR. PARMLEY: Just, your Honor, that there was a gap of a couple of years, looks like at least two years between Mr. Hurwitz's release from federal custody and commission of these new offenses. He did have a period of time of a couple years where he was demonstrating that he can stay on the right side of the law.

He made a terrible choice to get back with ███ ███████ who was his codefendant back in 2014 at that burglary incident as well. If he cuts off that tie and that communication, he knows that he's smart enough. He knows that he's capable enough of earning a legitimate income to support himself and his family. And that would be our request that he be allowed the opportunity to do so and to work to make right the economic harm that was caused.

With that, your Honor, we'll -- Mr. Hurwitz has a statement he's prepared.

THE COURT: All right. Thank you. Mr. Hurwitz, now

it's your chance to make your statement. Go ahead.

**(The transcriber was unable to hear and understand the defendant due to a very muffled record.)**

THE DEFENDANT: Thanks, your Honor. (Inaudible) (inaudible) (inaudible) (inaudible) (inaudible). Good morning, your Honor. I'd like to start off by apologizing (inaudible) (inaudible) (inaudible) (inaudible.)

THE COURT: You're cutting -- is there a way you can get closer to the microphone?

THE DEFENDANT: Yeah, I can. Can you hear me?

THE COURT: It's not that you're cutting so much as it's echoey. I'm going to mute my microphone and ask the others to mute theirs and see if it helps, but it may be the room you're in. Let's try again.

THE DEFENDANT: Okay. Can you hear me now? Good morning, your Honor. I'd like to start off by apologizing (inaudible) (inaudible) (inaudible) (inaudible) (inaudible). This is not who I am and I have beat myself up every day (inaudible) (inaudible) (inaudible) me away from my family and our daughter who was only one month old when I was arrested (inaudible) (inaudible).

Now she is (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible). (Inaudible) and I want (inaudible) (inaudible) and I want (inaudible) (inaudible) (inaudible)

(inaudible). I want to change (inaudible) (inaudible) (inaudible) (inaudible) (inaudible). I did this because I was scared (inaudible) that I didn't have enough (inaudible) (inaudible).

(Inaudible) (inaudible) (inaudible) (inaudible). (Inaudible) (inaudible) (inaudible) (inaudible) (inaudible). I know where I went wrong and (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible). I am not the man I was one year ago (inaudible) (inaudible) (inaudible) (inaudible). (Inaudible) (inaudible) (inaudible). (Inaudible). I've secured employment (inaudible) (inaudible) airport (inaudible) (inaudible) (inaudible) and as well as Wyoming working for (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible).

I also still (inaudible) (inaudible) (inaudible) (inaudible). (Inaudible) (inaudible) (inaudible) (inaudible) because I want to make things right (inaudible) (inaudible) (inaudible) (inaudible). (Inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) ████████ and all of their employees.

I just want them to know how sorry I am for (inaudible) (inaudible) (inaudible) and I am taking all of the rights steps and making (inaudible) (inaudible). I want ████████ to know that I am (inaudible) (inaudible)

(inaudible) (inaudible). (Inaudible) (inaudible) (inaudible). Once I am released I am going to complete (inaudible), continue to work hard, provide for my family, work towards a career, stay away from negative (inaudible) (inaudible) (inaudible) (inaudible).

(Inaudible) (inaudible) successful (inaudible) the right way (inaudible) (inaudible). What I did was wrong and embarrassing to myself, my family. This is not (inaudible). The life I want is sitting at home (inaudible). I want to be a great father, great husband and a respectful (inaudible) person. Once again, I apologize for what my actions caused (inaudible) (inaudible) (inaudible) (inaudible).

Please allow me one chance, your Honor, (inaudible) (inaudible) (inaudible) get back to work (inaudible) (inaudible) (inaudible) (inaudible) (inaudible), please, your Honor. If I may just (inaudible) (inaudible). I really am sorry for what I did. (Inaudible) (inaudible) my behavior. Yeah, I do have (inaudible) (inaudible). (Inaudible) (inaudible). I don't have an excuse (inaudible). (Inaudible) (inaudible) (inaudible) (inaudible).

I have a daughter at home (inaudible). (Inaudible) (inaudible) (inaudible) and I don't live this life anymore. I want to be (inaudible) them. (Inaudible) sorry. (Inaudible) and the victims in this case (inaudible) and just say sorry to my family. I won't disappoint anybody again. (Inaudible)

(inaudible). I have the work to pay back the restitution. I want to change and I am changing. Please (inaudible) just one more chance, just one chance to do (inaudible) (inaudible) (inaudible). I'll complete probation. I'll show everybody that I (inaudible) (inaudible). Thank you. (Inaudible) (inaudible).

THE COURT: All right. Thank you, Mr. Hurwitz, for that statement.

THE DEFENDANT: Thank you.

THE COURT: I acknowledge you've been in jail for a long time, eight months. And it's good to see that you acknowledge that you've compromised a lot of people. It's disappointing. I guess any business is vulnerable to some extent, but these were all (inaudible) owned, small family kind of businesses. This is really heartbreaking.

I'm going to make some findings from Form 6 on the presentence report. The Court agrees with the probation writer that -- sorry with the PSA writer that these crimes caused substantial monetary loss. Sometimes damage to the building and property was much worse than the cash actually obtained.

The Court finds from these victim impact statements that these crimes caused substantial psychological injuries that many individuals, employees involved required counseling. Business owners that couldn't even conduct their business for a period of time because of damage to their property.

# Addendum B

# Hurwitz Sentencing Hearing

# Reconstituted Transcript

(with redactions for privacy purposes)

a good son and a good friend and try to be a good father and still be dangerous to society. And he's demonstrated that over the last 13 years in the history (inaudible).

So we'd ask the Court to deviate from the PSI and order that he serve prison on these cases concurrent.

THE COURT: All right. Thank you, Mr. Kinnerley. Mr. Parmley, do you want to say anything else before you turn time over to your client?

MR. PARMLEY: Just, your Honor, that there was a gap of a couple of years, looks like at least two years between Mr. Hurwitz's release from federal custody and commission of these new offenses. He did have a period of time of a couple years where he was demonstrating that he can stay on the right side of the law.

He made a terrible choice to get back with ███ ███████ who was his codefendant back in 2014 at that burglary incident as well. If he cuts off that tie and that communication, he knows that he's smart enough. He knows that he's capable enough of earning a legitimate income to support himself and his family. And that would be our request that he be allowed the opportunity to do so and to work to make right the economic harm that was caused.

With that, your Honor, we'll -- Mr. Hurwitz has a statement he's prepared.

THE COURT: All right. Thank you. Mr. Hurwitz, now

it's your chance to make your statement.  Go ahead.

**(The transcriber was unable to hear and understand the defendant due to a very muffled record.)**

THE DEFENDANT:Thanks, your Honor. Um, I wrote, I was going to speak on, about the (Inaudible) Good morning, your Honor.

I'd like to start off by apologizing (inaudible) everyone else (inaudible) decisions and actions.

THE COURT:  You're cutting -- is there a way you can get closer to the microphone?

THE DEFENDANT:  Yeah, I can.  Can you hear me?

THE COURT:  It's not that you're cutting so much as it's echoey.  I'm going to mute my microphone and ask the others to mute theirs and see if it helps, but it may be the room you're in.  Let's try again.

THE DEFENDANT:  Okay.  Can you hear me now?  Good morning, your Honor. I'd like to start off by apologizing to the court, (inaudible)and friends and family who have been affected by my decisions and actions. This is not who I am and I have beat myself up every day for the last 245 days (inaudible) my actions have taken me away from my fiancee and our daughter who was only one month old when I was arrested and sent to jail. Now she is smiling, crawling and learning to talk and figure out the world while I have sat here (inaudible)fiancee(inaudible) do all the work (inaudible) by herself during this whole covid pandemic. I know what I did was wrong, and I want to fix this mess and do better(inaudible)I want to change this perception I've created about myself because of all this because that is not who I am.

I did this because I was scared and worried that I didn't have enough (inaudible). I didn't think the job I had (inaudible) enough to provide for my family. I was stupid and foolishly reached out for help in the wrong direction and allowed poor choices to be followed by other poor choices. I jeopardized my safety, freedom, while causing my fiancee and our newborn to struggle for the past eight months alone.

I know where I went wrong and I know that that (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible) (inaudible). I am not the man I was one year ago and I'm going to show everyone (inaudible) (inaudible). To start off my way by applying for my release from here I've secured employment here in Utah doing carpentry work at the airport making 3500 plus and as well as Wyoming working for Cyclone drilling three weeks out of the month bringing home 4500 dollars to five plus depending upon my work progression. I also still have web design clients I may still be able to service in my spare time. (Inaudible) of these jobs, even though it's not a lot, I can start paying back (Inaudible) (inaudible) decisions because I want to make things right and pay back every last cent I took no matter how long it takes. Being in here for the time I have been in here has give me time to think about how my actions have affected ████████, ███████████, ████████ and all of their employees. I just want them to know how sorry I am for my behavior and poor choices and I am taking all of the right steps and making them all whole again. I want ███████████ to know that I am

already in the process of returning back(inaudible) what I took and hopefully bring them peace of mind. Once I am released I am going to complete (inaudible), continue to work hard, provide for my family, work towards a career, stay away from negative peers (inaudible) productive member of society. I plan on becoming a successful (inaudible) the right way (inaudible) (inaudible). What I did was wrong and embarrassing to myself, my family. This is not the life I want to live. The life I want is sitting at home waiting for me. I want to be a great father, great husband and a respectful and trustworthy person. Once again, I apologize for what my actions caused and I am willing to do everything it takes to make it right (inaudible) (inaudible).

Please allow me one chance, your Honor, to go home to my family, provide for my family(inaudible)(inaudible) get back to work and start paying back restitution(inaudible) (inaudible) (inaudible), please, your Honor. If I may just add a few more things. I really am sorry for what I did.Um, there's no excuse for my behavior. Yeah, I do have a bit of a past (inaudible) I wasn't (inaudible)the best of kids. I don't have an excuse for that. I was a knucklehead. I've grown every year. Yea, I've made some mistakes but this is the last. I have a daughter at home that I haven't seen. They've been struggling and I don't want to live this life anymore. I want to work hard for them and just be a good person. sorry. to you all, and the court, and the victims in this case (inaudible) and just say sorry to my family. I won't disappoint anybody again. I'm gonna be good.

I have the work to pay back the restitution. I want to change and I am changing. Please I'd ask just one more chance, just one chance to do (inaudible) (inaudible)(inaudible). I'll complete probation. I'll show everybody that I can do it (inaudible). Thank you. (Inaudible) listening to me (inaudible).

THE COURT: All right. Thank you, Mr. Hurwitz, for that statement.

THE DEFENDANT: Thank you.

THE COURT: I acknowledge you've been in jail for a long time, eight months. And it's good to see that you acknowledge that you've compromised a lot of people. It's disappointing. I guess any business is vulnerable to some extent, but these were all (inaudible) owned, small family kind of businesses. This is really heartbreaking.

I'm going to make some findings from Form 6 on the presentence report. The Court agrees with the probation writer that -- sorry with the PSA writer that these crimes caused substantial monetary loss. Sometimes damage to the building and property was much worse than the cash actually obtained.

The Court finds from these victim impact statements that these crimes caused substantial psychological injuries that many individuals, employees involved required counseling. Business owners that couldn't even conduct their business for a period of time because of damage to their property.