**2022 UT App 125**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
BRANDON MICHAEL SAMPLES,
Appellant.

Opinion
No. 20200537-CA
Filed November 10, 2022

Seventh District Court, Castle Dale Department
The Honorable Don Torgerson
No. 191700095

Emily Adams and Freyja Johnson, Attorneys
for Appellant, assisted by law students Rachel
Johnson, Hunter Sullivan, and Brock Mason[1]

Sean D. Reyes and William M. Hains, Attorneys
for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGE GREGORY K. ORME and JUSTICE JILL M. POHLMAN
concurred.[2]

---

1. *See* Utah R. Jud. Admin. 14-807 (governing law student practice in the courts of Utah).

2. Justice Jill M. Pohlman began her work on this case as a member of the Utah Court of Appeals. She became a member of the Utah Supreme Court thereafter and completed her work on the case sitting by special assignment as authorized by law. *See generally id.* R. 3-108(4).

TENNEY, Judge:

¶1      In early May 2019, an oil worker found a body lying on the side of a rural road in Emery County, Utah. The body was badly bruised and missing a finger. After law enforcement arrived and identified the victim (Victim), officers learned that Victim had spent his last night with two people: Brandon Samples and Samples's girlfriend (Girlfriend).

¶2      Police soon located Girlfriend, and over the course of several interviews, Girlfriend told officers that Samples had killed Victim and cut off his finger. Based on her claims and other collected evidence, the State charged Samples with murder, desecration of a human body, and three counts of obstructing justice. The case later went to trial, and at its close, the jury convicted Samples.

¶3      On appeal, Samples challenges his murder conviction on multiple grounds. First, Samples claims that his trial counsel (Counsel) was ineffective for not asking the district court for a midtrial continuance to allow him to locate a rebuttal expert to counter some of the State's medical evidence, and Samples asks us to remand so that he can introduce evidence to support this claim. *See* Utah R. App. P. 23B. Second, Samples claims that two officers should not have been allowed to repeat some of Girlfriend's out-of-court statements during their trial testimonies. Third, Samples contends that Counsel was ineffective for not objecting when a detective gave his opinion about whether Girlfriend could have caused Victim's injuries. Finally, Samples argues that he was prejudiced by the cumulative effect of the alleged errors.

¶4      For the reasons set forth below, we reject each of Samples's arguments (including his request for a rule 23B remand) and affirm his conviction.

## BACKGROUND[3]

### *The Murder*

¶5 On Sunday, April 28, 2019, Brandon Samples was with Girlfriend at her house in Huntington, Utah, when he suggested that they visit Victim at Victim's motel room in Price, Utah. Girlfriend agreed. Girlfriend had "never met [Victim] before," so when they arrived, she "just sat there" while Samples and Victim chatted. While there, Victim showed them a "stone" that he had made in memory of his late mother. He then offered to make one for Samples because Samples's mother, whom Victim had been friends with, had recently passed away. Samples had previously been in a "playful mood," but this offer angered him, presumably because Samples believed that Victim had killed his mother.

¶6 Samples and Girlfriend then left and went to the house where Samples lived. Once there, Samples borrowed some power saws from his landlord and plugged them in so that they could charge. While the saws were charging, the couple ran a few errands, during which time Samples used meth twice. Girlfriend also tried to inject herself, but she was apparently unsuccessful.

¶7 Samples and Girlfriend later went back to Victim's motel room. While there, Victim, who was looking for a place to live, mentioned that he "had a U-Haul full of his stuff." Girlfriend offered to let him store things in her shed, which she mentioned had electricity. Victim said something about the shed "sound[ing] like some place where [he] could live," and Samples "got really upset and started acting really jealous." From Girlfriend's perspective, it seemed like Samples thought she and Victim "had something going on."

---

3. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Rivera*, 2019 UT App 188, n.1, 455 P.3d 112 (quotation simplified).

¶8 The three decided to look at Girlfriend's shed, so they got in her car and drove to her house in Huntington. It was a cold night, and once they were there, Girlfriend went inside to put on warmer clothes while Victim and Samples went to look at the shed. But Girlfriend had a problem—namely, she'd recently broken her dominant arm, she'd had a cast on it for about a week, and it was "difficult [for her] to use" her arm because she was "still in pain." Once inside, she realized that she needed Samples's help just to tie her shoes.[4]

¶9 After the three were back together in the house and ready to go back to Price, Samples told Victim that the car was unlocked and that he and Girlfriend would "be out in just a minute." When Victim left, Samples shut the door and said, "I'm going to kill [Victim]." At that point, Girlfriend "really wasn't sure" that Samples was going to do anything. But before they left, Samples instructed Girlfriend to put her phone in the bedroom "so that [they] couldn't be tracked."

¶10 The group took "the back roads to Price" and started driving on a dirt road. Samples suggested they stop and go rock hunting, something that Girlfriend enjoyed doing. Around 1:00 a.m., Samples pulled off the road and Girlfriend "jumped out" of the car with a flashlight and "took off . . . straight out from the car." Girlfriend "was quite a ways from the car" when she turned around and saw Samples standing by her car. He was putting on latex gloves and had placed two metal baseball bats against the

---

4. There was some inconsistency at trial about whether it was Girlfriend's arm or instead her hand that was broken. At trial, she said that her "arm was broke[n]," but she also agreed with the statement that her "right hand" was broken. For consistency, we refer to her as having a broken arm because that was the more common description of her injury at trial. But to the extent that any of our conclusions turn on her broken arm, we would reach the same conclusions if it was her hand that was broken.

side of her car. Despite her earlier doubts, when Girlfriend saw Samples with the bats, she now believed "[t]hat he was serious about what he said at the house, that he was going to kill [Victim]." She was also scared for her own life because Samples had previously threatened her.

¶11 Victim had walked up the road a bit, and Girlfriend felt like she needed to warn him. She pointed her flashlight at the ground and started walking toward him. But before Girlfriend could get to him, she heard what sounded like a bat swinging and hitting Victim. Girlfriend heard Victim say, "No, [Samples]. Why?" She heard Victim "[b]egging for his life," after which she heard Samples say, "You know why."

¶12 When Girlfriend got to where Samples was standing, he handed her a bat and told her to hit Victim. Victim said to Girlfriend, "No, not you." But Girlfriend was "scared of [Samples]," so she "hit [Victim] in the arm and in the leg" as Samples had requested. Girlfriend could "[b]arely" grip the bat because of her cast, and her arm "hurt like hell" when she swung the bat. After she hit Victim, Girlfriend "dropped the bat" and ran back to her car. As she stood there, she heard Samples hit Victim "a few more times," after which he returned to the car. Samples said, "I think he's dead," but he then grabbed Girlfriend's flashlight and flashed it back in Victim's direction. When Samples saw that Victim had crawled away, he went back to him and said, "You thought you were going to get away, huh?" Victim asked, "Why are you doing this, [Samples]?" Samples replied, "You know why I'm doing this. You killed my mom." Samples then "started swinging" the bat "uncontrollably" at Victim. During this beating, the bat that Samples was using—which already had a "small crack in it"—broke in two. Girlfriend "heard a gurgling," which she believed was Victim "choking on his own blood."

¶13 When Samples stopped hitting Victim, he grabbed the bats and Victim's hat and wallet, got in the car, and told Girlfriend to

get in the car and start driving. As Girlfriend drove, Samples rolled down his window and threw out the bat that Girlfriend had used and part of his broken bat. He was "excited" and said, "I can't believe I broke one of the bats." Samples then told Girlfriend that they needed to "get [their] stories straight." He said, "If anybody asks, we dropped [Victim] off" by Samples's landlord's house "because he needed to go talk to somebody about owing them some money and he was going to get a ride back to the motel." Girlfriend, who was "in shock" and "scared," agreed to tell that story.

¶14    Back at Girlfriend's house, Samples and Girlfriend ate and then injected themselves with meth. Samples also called his brother (Brother), and Girlfriend heard him say, "Remember what we talked about? Well, it's done." After the phone call, Samples told Girlfriend that they needed to go back to the dirt road "because he dropped a cigarette butt and he didn't want no DNA left up there." Girlfriend's car had a flat tire from their earlier excursion, so Samples borrowed a friend's car. Before leaving, Samples put a cooler and the saws in the backseat. On the way to Victim's body, they stopped to get gas. There, Samples put a trash bag in the garbage can next to the pump. Inside the bag was the remaining piece of the broken bat, Victim's hat, and Victim's wallet.

¶15    Back at the dirt road, Girlfriend helped Samples "tidy up the crime scene." While doing so, she found the cigarette butt that Samples had discarded earlier and put it in the car. She also picked up Victim's glasses, some batteries that were in the road, and a shovel that was lying on the side of the road. The shovel was from Girlfriend's car, but she didn't know why it was lying there. Girlfriend then went back to the car to meet Samples. Samples now had the saws out, and "he went over to [Victim] and tried to cut [Victim] up." But the "battery wouldn't work," so Samples put the saws back in the car and asked Girlfriend for her knife.

¶16    Samples took Girlfriend's knife and went over to Victim's body. When he came back, "he had [Victim's] finger in his hand." He told Girlfriend that her knife "had cut through [Victim's] finger perfectly. He only had to . . . tear off the last little bit." Girlfriend noticed that Victim's severed finger had a ring on it. The ring was "sentimental" to Samples because it matched one that belonged to his mother. After showing her the finger, Samples put it in a latex glove and placed it in a cooler in the car's back seat.

¶17    On the way back to Girlfriend's house, Samples threw a different pair of latex gloves out the window. He then said, "Oh, shit I shouldn't have done that." He told Girlfriend, who was driving, to turn around so they could retrieve the gloves. As they did, they found the bat that Samples had previously thrown out of the window. But although they looked, they were unable to find the other piece of the broken bat that he had thrown out. The two arrived at Girlfriend's house sometime around noon. Later that night, Samples used a corded saw to cut the bat into pieces. He put the pieces in a trash bag and threw the bag away at a nearby laundromat.

¶18    The next morning, Samples went to work with his uncle (Uncle). Before he left, Samples instructed Girlfriend to "make sure everything was cleaned up." Girlfriend thoroughly cleaned her car and then washed all of her and Samples's clothing. She also hid the knife that Samples had used to cut off Victim's finger under a false bottom in a kitchen cupboard. Girlfriend tried to vacuum up the metal shavings from where Samples cut the bat, but she was unable to get them out of the carpet. As she cleaned, Girlfriend noticed a pair of latex gloves soaking in Drano inside a trash can.

*The Investigation*

¶19    Two days later, an oil worker was driving down a rural road when he saw a man's body lying on the side of the road. The

worker called county dispatch, and officers arrived a short time later. The responding officers included a captain (Captain) and a detective (Detective) from the Emery County Sheriff's Office. The officers collected evidence at the scene, including a cigarette butt that they found on the road next to a patch of blood. The officers did not recognize the man, but they soon learned that Victim had been reported missing in Carbon County. Officers from Carbon County arrived shortly after and identified the man as Victim.

¶20 Officers soon spoke to a friend of Victim who said that she had last seen Victim the previous Sunday in his Price motel room. She also told officers that Victim had left his room with two people: Samples and Girlfriend.

¶21 Officers learned that Samples was on parole with Adult Probation & Parole (AP&P), so they went to Girlfriend's house to interview Samples and Girlfriend. Samples's AP&P agent came as well, and he had Samples provide a urine sample. Samples tested positive for drugs and was immediately placed under arrest and taken to jail.

¶22 After Samples was arrested, Girlfriend agreed to be interviewed at the sheriff's office. Once there, Girlfriend was interviewed by Detective and Captain. When they asked her about Victim, she initially provided the story that she and Samples had agreed on earlier—that she and Samples had dropped Victim off at Samples's landlord's house at some earlier point and that they hadn't seen him since.

¶23 Captain was skeptical, however, so he told her that he didn't believe her and that he suspected there was "some more" that she wasn't telling them. After additional questioning, Girlfriend said that she didn't want to testify or "get in trouble." At that point, Girlfriend changed her story. She said that after leaving her house together, the three had stopped on a rural road to go rock hunting. She told the officers how Samples killed

Victim with a bat and threw the bat out the car window on the drive home.

¶24    Captain and Detective asked Girlfriend to give them directions to where Victim died. Though it was around 2:00 a.m., she took them "right to the body location where [they] had located [Victim] earlier that day." Captain and Detective used flashlights to look for the bat, but they were unable to find it in the dark. Later that morning, Captain and Detective returned to the crime scene. Captain found the remainder of the broken bat in a ravine near where Girlfriend said Samples had thrown it out. The bat was "black or dark colored," and "the end of [it] was gone" and "jaggedy" as if it had broken.

¶25    The next day, Captain and Detective interviewed Girlfriend again. During this interview, Girlfriend told the officers about how Samples had borrowed "battery-operated saws." She told them for the first time that there had been more than one bat and that Samples had tried to "dismember [Victim] at the scene." She also described Samples's efforts to destroy the evidence.

¶26    After this interview, Captain and Detective executed a search warrant at Girlfriend's home. There, they found latex gloves in a trash can and noticed a "chemical smell" coming from the trash can. The officers also found three saws—two of which were battery-operated and one of which was corded. The corded saw had "small, metal-metallic pieces or shavings" on it. The officers tested the battery-operated saws, but "none of them worked." The officers also took Girlfriend's knife after she showed them where it was hidden underneath her kitchen cabinet.

¶27    The officers later obtained security footage from the gas station that Samples and Girlfriend had visited shortly after Victim died. The video showed "Samples open the [car] door, reach in, his feet come out, lean to the garbage can, then back in, the feet come up, and the door shuts." The officers searched the

dumpsters, but they had been emptied since Samples and Girlfriend were there.

¶28    The next day, Captain interviewed Samples, who was still in custody. Samples admitted that he and Victim were friends, but he denied being involved in Victim's murder. Samples gave the same story that Girlfriend had initially given—namely, that Samples, Girlfriend, and Victim went to look at Girlfriend's shed and that the night had ended when Samples and Girlfriend dropped Victim off by Samples's landlord's house.

*The Trial*

¶29    The State charged Samples with murder, desecration of a human body, and three counts of obstructing justice. The case proceeded to a five-day jury trial. At trial, the State presented testimony from several witnesses, including the oil worker who found Victim's body, Girlfriend, Captain, Detective, Uncle, Brother, a biologist from the state crime lab, the medical examiner (Medical Examiner), and an inmate (Inmate 1) who knew Samples in prison.

¶30    Girlfriend testified to the events recounted above, giving her account of how Samples killed Victim and attempted to dispose of the evidence. On cross-examination, Counsel went over Girlfriend's interviews with Captain and Detective, highlighting her initial lies and inconsistencies. During this questioning, Girlfriend acknowledged that she had initially lied to the police and also that she had taken "the long way around a lot of things." But on questioning from the State, Girlfriend said that she lied because she was scared of Samples, claiming that she eventually told the truth once she felt safe.

¶31    In his testimony, Captain detailed the investigation that led to Samples's arrest. Captain also recounted some of what Girlfriend had said during her interviews. Counsel did not object to the portions of Captain's testimony in which he recounted

some of Girlfriend's statements. Instead, on cross-examination, Counsel prompted Captain to discuss the various lies and inconsistencies in Girlfriend's statements to police.

¶32    Detective likewise detailed the investigation. Like Captain, Detective also recounted some of Girlfriend's interview answers. Counsel objected on hearsay grounds when Detective repeated Girlfriend's statements. But the court overruled the objection, stating, "It's been in court. We've heard her testimony. I want to see if that is consistent."

¶33    On direct examination, the prosecutor asked Detective whether he thought it was "logical" that Girlfriend could have caused all of Victim's injuries even with her arm being in a cast. Detective responded,

> I – I don't think so, just based on that cast on her wrist and running through the palm of her hand. I think that would make that difficult to control of that. I don't know. I've held many things in my hands at the same time and it's never been a comfortable thing, but – I wouldn't think so, but I – that's just my opinion.

¶34    A biologist from the state crime lab also testified. She testified that the lab had tested the cigarette butt, the broken bat, Girlfriend's cast, and Girlfriend's knife. She said that there was no blood detected on Girlfriend's cast. She also said that DNA from the cigarette butt, a bloodstain on the broken bat, and a bloodstain on Girlfriend's knife all matched Victim's DNA.

¶35    In her testimony, Medical Examiner recounted her findings from the autopsy. She testified that Victim's face had "multiple tears of the skin and fractures . . . that went from his forehead down to below his chin." She said that Victim had "knocked out" and loose teeth. She explained that Victim's "outer skull had multiple fractures" and that "all of the bones on the left side [of

the skull] had fractures that radiated through them." She said that Victim's head had twelve "distinct injuries," indicating twelve "distinct sites of impact." She further said that Victim had injuries, bleeding, and bruising to his brain. As for Victim's upper body and arms, Medical Examiner testified that there were "some bruises and scrapes on the skin of the chest" and "bruising of both of the arms." She testified that his left arm had "a very visible deformity to it" and "bruises that went from the upper arm down to the fingers." She testified that bones in his left forearm were "broken below the elbow" and "right above the wrist." And on his right arm, she said that there were "pretty large bruises with swelling mostly to the right hand."

¶36 The prosecutor also asked Medical Examiner to explain the term "defensive injury." Medical Examiner responded that a "[d]efensive injury is an injury somebody obtains when they're trying to protect themselves." The prosecutor then asked a few more questions about defensive injuries, and Medical Examiner answered them without offering an opinion as to whether Victim's injuries were defensive injuries. Later, however, Medical Examiner confirmed that Victim's bruising could "be another indication of a possible defensive wound."

¶37 Medical Examiner also discussed Victim's missing finger. She opined that it was "probably" amputated after death "given the absence of blood in the tissues around the cuts." When the prosecutor asked about the bruising, Medical Examiner responded:

> So the bruising would have been inflicted before he had died. You don't bruise after you're dead because – after you're dead because you need circulation of blood through your body to bruise. So the bruising would have been – would have occurred before he died and then his finger would have been amputated after he was already dead.

She noted that Victim's "bruises have the same general appearance and the same color to them," and she explained that this led her to "think that they were all obtained at the same time."

¶38 When Brother testified, he confirmed that his mother and Victim were friends and had matching rings. He testified that Samples thought Victim had poisoned their mother. Brother further testified that on the night Victim died, Samples was upset with Victim over living arrangements. He said that Samples told him, "I am getting tired of [Victim's] shit. I'm just going to slap him." According to Brother, Samples called later that night and said something to the effect of "the deed's done." Brother thought this was in reference to "slapping [Victim] or beating him up."

¶39 Brother also testified that the day after the phone call, Samples visited him and told him that he and Girlfriend "took [Victim] out to the desert and hit him with a bat." He said that Samples told him that Girlfriend hit Victim "with a bat first." According to Brother, Samples then asked Brother if he wanted "to see a hand" and began to "pull out like a Ziplock baggie out of his coat." Brother didn't see anything else, and he told Samples to leave.[5]

¶40 The prosecution also called Inmate 1 to testify. Inmate 1 and Samples spent time in prison together after Samples was arrested for Victim's murder, and Inmate 1 now claimed that they became friends.[6] According to Inmate 1, Samples "broke down" one day and said, "I fucking did it. I killed him. I don't know what

---

5. Counsel called Uncle as a rebuttal witness, and Uncle testified that he "wouldn't believe a word [Brother] says."

6. Persons who are charged with offenses but have not yet been tried are typically held in jail. Here, though AP&P initially took Samples to jail after he failed the drug test, Samples was taken to prison while awaiting trial because of a parole violation.

to do. Do you think I'm screwed? Do you think I'm going to do the rest of my life in prison." According to Inmate 1, Samples said that "after the guy was dead, his finger was too swollen to pull off the ring so he had to cut off the finger to get the ring." When asked why he was testifying, Inmate 1 explained that he was in prison on a federal gun charge and that he hoped the "federal government" would take his testimony "into consideration with [his] sentence." But he also clarified that he wasn't "guaranteed" anything.

¶41    After the State rested, the defense presented its case. There were two defense witnesses: Samples and another inmate (Inmate 2). In his testimony, Samples denied having any motive to kill Victim, claiming that Victim was his friend and had been there for Samples during his "hardest times." Samples denied believing that Victim killed his mother. And, of note, Samples blamed Girlfriend for Victim's death. According to Samples, Girlfriend got mad at him while they were driving Victim back to Price. He said that she started "clubbing" him on the head, so he jumped out of the car, and she drove off. Samples said that he started walking along the road and that she came back a while later without Victim. He said that when they got back to Girlfriend's house, Girlfriend started to cry and told him that Victim "forced himself on her" after they stopped to go rock hunting. In response, she allegedly grabbed a bat from her car and started "smacking" Victim with it, breaking the bat in the process. According to Samples, she tried to use a "mini shovel" to dig a hole but couldn't "because of her hand and the size of the shovel."

¶42    During cross-examination, Samples was asked how Girlfriend could have swung a bat with her cast. Samples responded that although she couldn't dig a hole, "she does everything herself" and "could swing a bat." When Samples was asked if he believed Girlfriend's story that Victim attacked her, he said, "I do, kind of, but I don't know." He added, "I've known [Victim] personally and I don't see him just grabbing somebody.

But that's what she told me. And she was pretty hysterical, so I believed her."

¶43 Samples also testified that after hearing Girlfriend's story, the two came "up with a plan to either get rid of [Victim] and dispose of his body or rough him up and . . . make him look like he fell." But Samples said that when they got to the scene, they had difficulty moving Victim's body because Girlfriend "couldn't really lift a lot." Samples said that though he had a saw, he decided against "chopping him up," so he instead got a bat and "started hitting [Victim]." Samples admitted that he hit Victim in the face "[p]robably like four or five times, six times," and that it "[c]ould have been more." He also admitted that he hit Victim in the arm, "[p]robably like three times." He said that he then handed the bat to Girlfriend and that she hit Victim as well. Samples also explained Victim's missing finger. He said that he, his mother, and Victim all had matching rings. Samples didn't have his anymore, so when he saw the ring on Victim's finger, he decided to take it because it was "sentimental." By his own account, he was unable to get the ring off Victim's finger, so he decided to cut the finger off. Qualifying his own actions, however, he said that he didn't take any of Victim's other jewelry because "[t]hat would be wrong." Samples said he put the ring in a latex glove, and they left. Samples later testified that he "ended up throwing [the ring] out."

¶44 Samples also admitted that he cut up the bat but only because he was helping Girlfriend get rid of the evidence. He said that he put the pieces of the bat, Victim's hat, a pair of gloves, and Victim's finger into a trash bag, after which he walked to a nearby laundromat and put the bag in its garbage can.[7] Samples also

---

7. Although Samples testified that he threw the finger away at the laundromat, the State presented evidence at trial that a cadaver dog gave a "reliable indication" that there were human remains in a fire pit behind Samples's house.

talked about his phone call with Brother. He admitted that the conversation happened, but he claimed that he was talking about arranging a ride and not about harming Victim.

¶45　Samples further admitted that he didn't "expect nobody to believe" him. He said that he wouldn't be surprised if nobody believed that a woman with a broken arm killed somebody she just met. All in all, he agreed that his story was "ridiculous."

¶46　After Samples testified, the defense called Inmate 2. Inmate 2 said that he "briefly" lived on the same cell block as Samples and Inmate 1. Inmate 2 said that he had "never once seen Mr. Samples have a conversation with [Inmate 1]" and recalled that when somebody else once mentioned Inmate 1, Samples "had no idea who [the] guy was." According to Inmate 2, Samples and Inmate 1 "were no different than two people passing in the street." He further noted that Inmate 1 had recently been housed with Brother, and from this, he speculated that Inmate 1 might have heard useful details about this case from Brother.

¶47　In his closing argument, the prosecutor acknowledged potential credibility problems with Girlfriend, but he claimed that the State had "corroborated" her account with testimony from officers and expert witnesses. The prosecutor then referred to Samples as the State's "best witness," pointing out that Samples had admitted to beating Victim. The prosecutor argued that the only question was whether Samples had beaten Victim before or after he died. He then reminded the jury of Medical Examiner's testimony that "all of those injuries occurred at the same time and all of them occurred before [Victim] died." He further stated, "It was her opinion that all of it happened before death, the beating, except for one, the finger." The prosecutor argued that it "doesn't even make sense" that Girlfriend would be able to bludgeon a man to death, given that she had a broken arm, let alone that she could do so without getting any blood on her cast.

¶48   In his closing, Counsel argued that Girlfriend was "not credible at all." He reminded the jury that she told "many different stories within each interview." He also discussed Brother's and Inmate 1's credibility issues. And Counsel further contended that Girlfriend would have had the strength to kill Victim because she was high on meth and had adrenaline in her system. He also pointed out that Girlfriend herself admitted to swinging the bat. Regarding Medical Examiner's testimony, Counsel challenged the prosecutor's interpretation of her testimony. He argued, "[T]here was no evidence that I heard that said – or they could say that there were no – that [Victim] was not stricken on that body after he was deceased." In rebuttal, however, the prosecutor claimed that he was "right about" Medical Examiner's testimony, but he also told jurors that they could relisten to Medical Examiner's testimony.

¶49   After relistening to Medical Examiner's testimony, the jury convicted Samples on all charges. Samples then timely appealed his murder conviction.[8]

ISSUES AND STANDARDS OF REVIEW

¶50   Samples first argues that Counsel "was ineffective when he did not request a continuance to find a rebuttal expert who could have testified about when the injuries were inflicted on Victim." Because the evidence for this claim is not in the record, Samples asks us to remand the case under rule 23B of the Utah Rules of Appellate Procedure so that the district court can make the relevant findings. A rule 23B remand is "available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

---

8. Samples did not appeal his other convictions.

¶51     Samples next argues that the district court erred by allowing Detective to recount Girlfriend's out-of-court statements. We review "the legal questions underlying the admissibility of evidence" for correctness, but we review the district court's ultimate "decision to admit or exclude evidence" for an abuse of discretion. *State v. Griffin*, 2016 UT 33, ¶ 14, 384 P.3d 186 (quotation simplified). Samples relatedly argues that Counsel was ineffective for not objecting when Captain testified about Girlfriend's out-of-court statements. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." *State v. Fleming*, 2019 UT App 181, ¶ 7, 454 P.3d 862 (quotation simplified).

¶52     Samples also argues that Counsel was ineffective for not objecting when Detective offered his opinion about whether Girlfriend could have caused Victim's injuries. This presents a question of law. *See id.*

¶53     Finally, Samples argues that there was cumulative error. Under the cumulative error doctrine, we "reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had." *State v. Goodrich*, 2016 UT App 72, ¶ 8, 372 P.3d 79 (quotation simplified).

ANALYSIS

I. Rule 23B Motion

¶54     As discussed, Medical Examiner testified that Victim's bruises "would have occurred before he died" because bruising requires "circulation of blood." Medical Examiner also opined that although "[i]t's difficult to know," the bruises were likely "all obtained at the same time." In his closing argument, the prosecutor relied on this testimony to argue that Victim's "injuries occurred at the same time and all of them occurred before he died." This interpretation conflicted with Samples's testimony

because Samples claimed that he hit Victim's body (and, thus, caused some of the injuries) after Victim was dead.

¶55    In his rule 23B motion, Samples argues that Counsel should have requested "a continuance to find a rebuttal expert who could have testified about when the injuries were inflicted on Victim." In support of this motion, Samples includes the unsworn declaration of a medical doctor who says that, if called, he would have testified that Victim's "arms could have been fractured pre- or post-mortem" because "[t]here is no way to tell whether the arm fractures were from defensive wounds pre-mortem or from inflicted injuries post-mortem." The doctor further opines that, in apparent contrast to the testimony at trial from Medical Examiner, "it is very difficult—if not impossible—to distinguish between pre-mortem bruises and post-mortem bruises or discolorations that resemble pre-mortem bruises." Samples contends that if the jury had heard this testimony, "there is a reasonable probability that the jury could have believed [Samples's] testimony that [Girlfriend] killed Victim and asked [Samples] to dispose of the body later, and that it was only after Victim had been dead for several hours that [Samples] inflicted the injuries on Victim."

¶56    We first set out the relevant law regarding rule 23B, ineffective assistance claims, and requests for continuances. Applying that law to Samples's motion, we then reject Samples's request for a rule 23B remand.

A.    Relevant Law

¶57    Under rule 23B, "[a] party to an appeal in a criminal case may move the court to remand the case to the trial court for entry of findings of fact, necessary for the appellate court's determination of a claim of ineffective assistance of counsel." Utah R. App. P. 23B(a). "The motion will be available only upon a nonspeculative allegation of facts, not fully appearing in the record on appeal, which, if true, could support a determination

that counsel was ineffective." *Id.* If the motion cannot "meet the test for ineffective assistance of counsel," then "there is no reason to remand the case." *State v. Griffin*, 2015 UT 18, ¶ 20, 441 P.3d 1166.

¶58 A criminal defendant claiming ineffective assistance must show that trial counsel performed deficiently and that the deficient performance was prejudicial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *accord State v. Ray*, 2020 UT 12, ¶ 24, 469 P.3d 871. "Because both prongs of the *Strickland* test must be met to establish ineffective assistance of counsel, we need not address both prongs if a defendant's claim clearly fails on one of them." *State v. Hurwitz*, 2021 UT App 112, ¶ 21, 500 P.3d 921 (quotation simplified).

¶59 As explained below in Part I(B), we resolve Samples's request for a remand on deficient performance grounds alone. To show deficient performance, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. We measure counsel's performance "under prevailing professional norms," and our "scrutiny of counsel's performance must be highly deferential." *Id.* at 688–89. When a defendant claims that counsel performed deficiently by not filing a motion, the defendant must "demonstrate that the motion would likely have been granted had it been filed." *State v. Vallejo*, 2019 UT 38, ¶ 42, 449 P.3d 39. "This is because the decision not to pursue a futile motion is almost always a sound trial strategy," and "where there is a sound strategy, a defendant cannot satisfy his burden of demonstrating that counsel's performance fell below an objective standard of reasonable professional judgment." *State v. Bond*, 2015 UT 88, ¶ 63, 361 P.3d 104 (quotation simplified); *see also State v. Makaya*, 2020 UT App 152, ¶ 9, 476 P.3d 1025 ("A futile motion necessarily fails both the deficiency and prejudice prongs of the *Strickland* analysis because it is not unreasonable for counsel to choose not to make a motion that would not have been granted . . . .").

¶60    Consistent with this approach, we have held that counsel did not render ineffective assistance by failing to request a continuance when counsel "could have reasonably concluded that the trial court would not continue the proceedings." *State v. Gunter*, 2013 UT App 140, ¶ 35, 304 P.3d 866; *cf. State v. Carter*, 2022 UT App 9, ¶ 67, 504 P.3d 179 (Hagen, J., dissenting) (agreeing that "[w]hen determining whether a motion would have been futile, Utah appellate courts invariably analyze the merits of the motion" and that "[t]he only instance in which we consider the trial judge's perceived receptiveness to the argument is when the judge has discretion in making the ruling"), *cert. granted*, July 11, 2022 (No. 20220297); *Mackin v. State*, 2016 UT 47, ¶ 33, 387 P.3d 986 (explaining that whether to grant a continuance "is at the discretion of the trial judge" (quotation simplified)). Moreover, when a defendant "moves for a continuance to procure the testimony of an absent witness," the defendant "must show" that: (1) "the testimony sought is material and admissible," (2) "the witness could actually be produced," (3) "the witness could be produced within a reasonable time," and (4) "due diligence has been exercised before the request for a continuance." *Mackin*, 2016 UT 47, ¶ 33 (quotation simplified).[9]

---

9. Samples cites *State v. Torres-Garcia*, 2006 UT App 45, ¶ 18, 131 P.3d 292, which identifies additional factors that might be assessed when considering whether a continuance should be granted. But courts have applied these factors when considering a defendant's request for a continuance based on the State's failure to provide the notice required by Utah Code section 77-17-13. *See, e.g., State v. Tolano*, 2001 UT App 37, ¶ 9, 19 P.3d 400 ("When reviewing a trial court's denial of a requested continuance for a section 77-17-13 notice violation, we consider four factors."). Samples's argument is not based on a failure of notice under section 77-17-13. We accordingly focus our analysis on the test formulated by our supreme court for the situation at

(continued…)

¶61    In sum, we will only grant Samples's rule 23B motion if it contains a "nonspeculative allegation of facts," "which, if true, could support a determination that counsel was ineffective." Utah R. App. P. 23B(a). And to "support a determination that counsel was ineffective," *id.*, Samples's 23B motion must demonstrate that a motion to continue "would likely have been granted had it been filed," *Vallejo*, 2019 UT 38, ¶ 42.

B.    Samples's Rule 23B Motion

¶62    Again, Samples faults Counsel for not requesting a continuance to locate a rebuttal expert, and in his rule 23B motion, Samples asserts that Counsel "could have found an expert that could have challenged the medical examiner's testimony about the timing of the injuries." We conclude that, even if true, the nonspeculative allegation of facts in Samples's rule 23B motion does not establish that Counsel performed deficiently. This is so for three reasons.

¶63    First, Samples has failed to make the requisite proffer. As noted, when a defendant "moves for a continuance to procure the testimony of an absent witness," the defendant "must show," among other things, that "the witness could actually be produced" and that "the witness could be produced within a reasonable time." *Mackin*, 2016 UT 47, ¶ 33 (quotation simplified). In support of his motion, Samples includes the curriculum vitae and declaration of a medical doctor, and that declaration includes the doctor's explanation of what he would have testified to had

_____

issue here. *See Mackin v. State*, 2016 UT 47, ¶ 33, 387 P.3d 986; *State v. Creviston*, 646 P.2d 750, 752 (Utah 1982). But even under the test Samples cites, whether to grant a continuance still "lies within the broad discretion of the trial court." *Torres-Garcia*, 2006 UT App 45, ¶ 10 (quotation simplified). And as we explain, Counsel had good reason to believe that the district court would not use its discretion to grant a continuance in this high-profile murder case.

he been called at trial. But Samples does not specifically allege or proffer that this or any other doctor who could have given similar testimony could have been produced within any particular timeframe, let alone a "reasonable time." For this reason alone, this claim fails for lack of proffered evidence.

¶64    Second, even if Counsel could have found such an expert, Counsel could have still reasonably decided that at this point in the trial, a continuance could actually be harmful to his client. The court had scheduled a week-long jury trial, with proceedings starting on Monday and "continu[ing] through" Friday "if necessary." The trial took the full week and ended on Friday. As a result, any additional continuance—even if it had been a short one—would have extended the case through the weekend.

¶65    But this murder trial took place in a small county with a relatively small population. Though seemingly speaking in jest, one potential juror said during voir dire, "All the folks in Emery County are related." Moreover, these were decidedly sensational charges. During voir dire, a potential juror said that "[r]umors" about the murder were "rampant" in Huntington and that it's "a big thing" when somebody is "arrested for murder in Emery County." Another potential juror said that "there's a lot of information floating around." And yet another potential juror explained, "[W]e live in small communities, so I think we've all heard [inaudible] but I don't know."[10] As a result, the court mentioned during voir dire that it had summoned "more than double the number of people that are usually" summoned for a jury trial.

¶66    Given the potentially combustible combination of a small town and a high-profile trial, Counsel could have reasonably believed that there might be some risk of jury contamination if the empaneled jurors were sent home for the weekend after having

---

10. None of these potential jurors served on the jury.

just heard a week's worth of evidence. And for similar reasons, Counsel could also have reasonably surmised that the court would be unlikely to grant any such request for a continuance at this critical juncture. From all this, Counsel "could have reasonably concluded that the trial court would not continue the proceedings," *Gunter*, 2013 UT App 140, ¶ 35, so Counsel did not perform deficiently by not requesting it.

¶67 Third, rather than addressing Medical Examiner's testimony through a proposed continuance and additional testimony, it appears that Counsel simply chose to respond to Medical Examiner's testimony in a different way. *See generally Ray*, 2020 UT 12, ¶ 34 ("If it appears counsel's actions could have been intended to further a reasonable strategy, a defendant has necessarily failed to show unreasonable performance."). After the prosecutor argued during closing argument that "all of" Victim's "injuries occurred at the same time and all of them occurred before he died," Counsel responded in his closing argument by pointing out that the State "did not provide any evidence to state [Victim] was not hit after he was deceased." And on this, Counsel was correct. Again, Medical Examiner only opined that the *bruising* couldn't have occurred after death, but she did not say that the *injuries* couldn't have been inflicted after death. (As noted, aside from the bruising in question, Victim's other injuries included fractures to his face and skull, broken bones in his left forearm, and missing teeth.) As a result, when the jury relistened to Medical Examiner's testimony after closing arguments, it would have known that the State's attempted use of this testimony was based on a false premise, thus undermining the argument from the State that is now at issue.

¶68 Samples has not demonstrated that it was objectively unreasonable for Counsel to address Medical Examiner's testimony through argument, as opposed to requesting a continuance so that he could present contrary testimony. Again, as recognized by *Strickland*, there "are countless ways to provide

effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." 466 U.S. at 689; *see also Harrington v. Richter*, 562 U.S. 86, 106 (2011) ("Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach." (quotation simplified)). Here, while Counsel could have chosen a different option, he was not required to do so.

¶69    Because of this, we conclude that the nonspeculative allegations in Samples's rule 23B motion do not "support a determination that counsel was ineffective." Utah R. App. P. 23B(a). We therefore decline "to remand the case to the trial court for entry of findings of fact." *Id.*

## II. Hearsay

¶70    In his trial testimony, Captain repeated some of Girlfriend's statements about the murder. Counsel did not object. Detective also recounted some of the statements that Girlfriend made about the murder, including, of note, Girlfriend's claim that Samples hit Victim with a baseball bat and then "continued to strike" Victim after Victim crawled away. Counsel objected on hearsay grounds, but the court overruled the objection.

¶71    On appeal, Samples argues that the court erred in allowing Detective's testimony. For similar reasons, Samples argues that Counsel was ineffective for not objecting to Captain's testimony. We see no basis for reversing on these grounds, however, because of our conclusion that Samples was not prejudiced.

A.    Detective's Testimony

¶72    Even if the court erred in allowing Detective's testimony, Samples must show that he was prejudiced by the error. *See* Utah R. Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be

disregarded."). An error is prejudicial "when we conclude that, absent the error, there was a reasonable likelihood of a result more favorable to the accused." *State v. Bell*, 770 P.2d 100, 106 (Utah 1988).

¶73 Samples initially contends that he was prejudiced by Detective's testimony because it "improperly bolstered [Girlfriend's] credibility." To be sure, "a witness may not offer a direct opinion of another witness's truthfulness on a particular occasion." *State v. King*, 2010 UT App 396, ¶ 44, 248 P.3d 984 (quotation simplified). But that's not what happened here. Detective repeated some of Girlfriend's out-of-court statements, but he did not testify, for example, that Girlfriend "appeared to be genuine, seemed to be quite candid about what she was telling" the officers, "or displayed indicators that would show a likelihood of honesty." *State v. Nunes*, 2020 UT App 145, ¶ 27, 476 P.3d 172 (quotation simplified). Because Detective did not "offer a direct opinion" of Girlfriend's "truthfulness on a particular occasion," *King*, 2010 UT App 396, ¶ 44 (quotation simplified), we agree with the State that "this is not" actually "a bolstering case" at all, *Nunes*, 2020 UT App 145, ¶ 27.

¶74 Even so, Samples also argues that he was prejudiced by the sheer repetition involved in the challenged testimony. When "testimony is merely cumulative," however, we are usually "disinclined to find prejudice even when the testimony was improperly admitted." *State v. Jones*, 2020 UT App 31, ¶ 35, 462 P.3d 372. This is so because cumulative testimony typically doesn't offer anything "new or additional" to the evidentiary picture. *State v. Thomas*, 777 P.2d 445, 450 (Utah 1989).

¶75 Here, Detective's challenged testimony was cumulative of Girlfriend's testimony. Indeed, at oral argument, Samples conceded (correctly, we think) that Detective did not add anything substantive when recounting Girlfriend's claims. While we acknowledge the possibility that repetition alone could

conceivably cause prejudice in certain circumstances, we nevertheless conclude that there was no prejudice here for several reasons.

¶76   First, Girlfriend testified at some length, and during her testimony, she gave a vivid firsthand account of Victim's murder. Of note, she described how Samples repeatedly hit Victim with a bat, how Samples ordered her to hit Victim too, how the couple disposed of the evidence after the murder, and how Samples cut off Victim's finger. Girlfriend also repeated several incriminating statements that Samples made before, during, and after the murder. During Girlfriend's testimony, the jury had the opportunity to observe her demeanor and assess her credibility for itself. We are unconvinced that, having done so, the jury's assessment of her claims would have been swayed in any meaningful way by Detective later repeating a few of her statements during his own testimony.

¶77   Second, although Detective recited the basic details of what happened, his recitation was fairly banal in comparison to Girlfriend's. For example, Detective testified that Girlfriend said that "she saw Mr. Samples strike [Victim] with a baseball bat" and heard Victim say, "No. Stop," and, "Why are you doing this?" But Girlfriend's account was less sanitized—she talked about hearing the bat hit Victim, hearing Victim beg for his life, hearing a "gurgling" sound, and seeing Samples swing the bat "uncontrollably" at Victim. Similarly, Detective testified that Girlfriend said Samples cut off Victim's finger. But Girlfriend testified further, talking about how she saw Victim's finger in Samples's hand and that she heard Samples say he had to "tear off the last little bit." In these and other similar exchanges, Girlfriend's in-court testimony went far beyond the brief snippets offered by Detective. Thus, although Detective recounted the basics of Girlfriend's version, we are unpersuaded that there was any harm to Samples where Girlfriend's testimony was far more graphic and detailed.

¶78 Third, Detective's repetition of Girlfriend's claims helped the defense in certain key respects. As noted, Girlfriend's initial accounts of what had happened were both inconsistent and self-serving. Seizing on this, Counsel argued in closing that Girlfriend was "not credible" because she was "evasive" and had told "many different stories within each interview." Counsel reminded the jury that Girlfriend's story changed "at least three times." Counsel further argued that with each successive interview, Detective and Captain had given Girlfriend "every chance she could to change her story and start thinking of ways to point the finger at [Samples] and get the finger off of her, and that's what she did."

¶79 Given this, even if it is true that Detective's repetition solidified the effects of Girlfriend's testimony, this would have cut both ways because Girlfriend's testimony was both good and bad for the defense. In other words, at the very same time that Detective's testimony was reinforcing the State's version of events, it was also reinforcing Samples's argument that Girlfriend was dishonest. As a result, we cannot say that this repetition prejudiced Samples's case.

B.     Captain's Testimony

¶80 Samples makes a similar challenge to Captain's testimony, but this time through an ineffective assistance claim. As noted above, Samples can only prevail on this claim if he shows both deficient performance and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687; *accord Ray*, 2020 UT 12, ¶ 24. And to satisfy the prejudice prong, Samples "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A

reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*[11]

¶81　Even assuming that Counsel was deficient for not objecting to Captain's testimony, we conclude that Samples has not shown that his defense was prejudiced as a result. This is so for essentially the same reasons given above with respect to Detective's testimony. First, Captain's testimony was merely cumulative of the much more detailed account that Girlfriend gave in her own testimony. As with Detective's testimony, we see no basis for concluding that Captain's brief recitation of certain portions of her testimony would have persuaded the jury to give her testimony any more or less credence.

¶82　Second, Counsel questioned Captain about Girlfriend's inconsistencies, again pointing out that Girlfriend gave the officers "several different versions" of what happened and that she likewise left key details out. As a result, any prejudice that Samples suffered from this testimony would have been counterbalanced by the benefits that he received from it.

---

11. Samples argues that a court's "'confidence in the outcome may be undermined at some point *substantially short*' of it being 'more probable than not' that the jury would have reached a different result." (Quoting *State v. Knight*, 734 P.2d 913, 920 (Utah 1987) (emphasis added).) The State, however, quotes *Harrington v. Richter*, 562 U.S. 86, 112 (2011), for the proposition that "the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is *slight* and matters only in the rarest case." (Quotation simplified.) (Emphasis added.) We need not resolve this disagreement, however, because we conclude that Samples has not shown prejudice under either proposed standard.

¶83    For these reasons, we conclude that Samples has not shown prejudice. We reject his ineffective assistance claim as a result.[12]

### III. Opinion Statement

¶84    Samples next argues that Counsel was ineffective for not objecting when Detective "speculat[ed] as to whether [Girlfriend] could have caused Victim's injuries while wearing a cast." Even if Counsel was deficient in not objecting, we conclude that Samples's argument again fails because of a lack of prejudice.

¶85    As explained, Samples "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. When conducting a prejudice analysis of this sort, "we assess counterfactual scenarios." *Ross v. State*, 2019 UT 48, ¶ 76, 448 P.3d 1203. When doing so, we "consider a hypothetical"—i.e., the "alternative universe in which the trial went off without the error." *State v. Ellis*, 2018 UT 2, ¶ 42, 417 P.3d 86. Here, we don't believe that there's a reasonable probability that Samples would have obtained a more favorable result if Counsel had successfully objected to Detective's challenged opinion testimony. This is so for several reasons.

¶86    First, we think it's unlikely that the jury's assessment of Girlfriend's ability to swing the bat turned in any meaningful way on Detective's opinion. This is primarily because the jury had several bases for assessing Girlfriend's abilities that were more direct and more probative. Of note, Girlfriend was questioned about her abilities in light of the injury. She testified that as a result

---

12. As discussed in more detail in Part IV, we are also not persuaded that the repetitions from Detective and Captain prejudiced Samples because of the strength of the overall evidence against him. In other words, even without these alleged errors, we see no reasonable probability or likelihood that Samples would have obtained a more favorable result.

of her broken arm and the cast, she couldn't tie her own shoes and had difficulty holding and swinging the bat. Samples also testified about her impairment, and in doing so, he acknowledged it. Samples told the jury that Girlfriend's cast prevented her from digging a hole and made it difficult for her to help him move Victim's body. Given this testimony on this very subject from Girlfriend and Samples, we're not convinced that the jury would have naturally relied on Detective's assessment of how her injury would have impacted her physical capabilities.

¶87 Second, it's also unlikely that Detective's opinion meaningfully mattered given that Detective was decidedly equivocal. When the prosecutor asked Detective if he thought it was "logical" that Girlfriend could have "done all of the damage" to Victim "especially with a cast on," Detective started by saying, "I – I don't think so." Detective then pointed out that Girlfriend had a "cast on her wrist and running through the palm of her hand." Continuing, Detective said, "I think that would make that difficult to control of that. I don't know. I've held many things in my hands at the same time and it's never been a comfortable thing, but – I wouldn't think so, but I – that's just my opinion." Thus, while it's true that Detective said he didn't "think" Girlfriend could have "done all of the damage" to Victim, he then undercut the force of his own opinion by stating that he "[didn't] know" and by reminding the jury without prompting that it was "just [his] opinion."

¶88 Despite all this, Samples suggests that Detective's opinion was still "likely to carry weight with the jury because it came from a law enforcement officer who seemed to have experience or training in this area." But Detective did not say that he was speaking from "expertise or training in this area"—rather, he told the jury that this particular opinion was based on his experience holding "many things in [his] hands at the same time," an experience that would hardly be unique to Detective. Moreover, even if the jury chose to infer on its own that Detective was

speaking based on some unspoken source of expertise, that inference, too, could have cut both ways. Again, Detective qualified his opinion, stating that he "[didn't] know" and that it was "just [his] opinion." If the State's "expert" witness couldn't definitively or confidently say that Girlfriend was incapable of causing Victim's injuries, the jury could have taken that as some support for the supposed plausibility of Samples's story.

¶89　In short, in a hypothetical trial in which Counsel successfully objected to Detective's challenged testimony, the jury would still have had more direct evidence of Girlfriend's abilities (testimony from Girlfriend and Samples about this), with the only change being the removal of Detective's equivocal statement about his perception of Girlfriend's abilities. For these reasons, we are unpersuaded that Samples was prejudiced by the alleged deficient performance. This claim accordingly fails.[13]

### IV. Cumulative Error

¶90　Samples's final argument is that the cumulative effect of the alleged errors requires reversal. We reverse under the cumulative error doctrine if we "determine that (1) an error occurred, (2) the error, standing alone, has a conceivable potential for harm, and (3) the cumulative effect of all the potentially harmful errors undermines [our] confidence in the outcome." *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 42, 428 P.3d 1038. The third element requires an assessment of "whether the defendant received a 'fair trial.'" *Id.* ¶ 39 n.27. And a "defendant is deprived a 'fair trial' when there is a reasonable probability that, but for the several errors, a different verdict or sentence would have

---

13. In addition to these issue-specific reasons for holding there was no prejudice on this claim, we likewise conclude that Samples suffered no prejudice due to the strength of the evidence against him, which, again, we discuss in Part IV.

resulted." *Id.*; *see also Ellis*, 2018 UT 2, ¶ 42 (recognizing that a "[p]rejudice analysis is counterfactual").

¶91 As detailed above, we've concluded that Samples was not prejudiced by Detective and Captain repeating statements from Girlfriend during their testimonies or Detective opining about Girlfriend's ability to injure Victim. But whether these sources of prejudice are viewed individually or collectively, our "confidence in the outcome" of the trial is also not undermined, *Martinez-Castellanos*, 2018 UT 46, ¶ 42, nor do we see a reasonable probability of a different outcome without any or all of the alleged errors. This is so because of the strength of the case against Samples.

¶92 At trial, Girlfriend gave a firsthand account of the murder. She was questioned at length by both the State and the defense, and the jury had the opportunity to evaluate her credibility directly. Samples's defense, however, rested on his contention that it was Girlfriend, not Samples, who killed Victim. But Samples's version had several significant problems.

¶93 Chief among them was that the jury had good reason to believe that Girlfriend could not have caused Victim's injuries. As discussed throughout this opinion, Girlfriend had a broken arm that was in a cast. At trial, Girlfriend explained to the jury how her broken arm (and the accompanying cast) impaired her ability to do even simple tasks like tying her shoes. Even so, while she acknowledged that she managed to hit Victim in the arm and leg (after Samples ordered her to), she testified that this "hurt like hell" and that she could "[b]arely" grip the bat. Samples himself also acknowledged that Girlfriend was limited because of her injury. For example, in his version of the events, he said that Girlfriend's broken arm prevented her from digging a hole and made it difficult for her to help move Victim's body.

¶94 But the jury received evidence showing that the killer had the ability to inflict significant injuries on Victim through the use

of violent and, of some note, repetitive force. The jury saw pictures of Victim's body, and those pictures showed the damage that was done to him. The jury also heard Medical Examiner testify in-depth about the damage to Victim's body: she said that his head had twelve "distinct injuries," that "all of the bones on the left side [of his skull] had fractures that radiated through them," that his brain was bruised, that both bones in his left forearm were broken, that his right arm had bruises and swelling, and that a finger was missing. Aside from the injuries themselves, the jury also heard that the assailant struck Victim with enough force to break a metal bat. Samples's story thus required the jury to believe that Girlfriend, whose broken arm made it difficult for her to dig a hole, move a body, or even tie her own shoes, was somehow able to repeatedly hit Victim with a bat with enough force to kill Victim and even break the metal bat.

¶95    This was implausible. Indeed, Samples acknowledged as much at trial, stating that he wouldn't be surprised if nobody believed that a woman with a broken arm had killed somebody in this manner. Samples even agreed that his own story sounded "ridiculous."

¶96    And the problems with his version of the events extended beyond Girlfriend's physical limitations. Of note, the jury heard testimony that no blood was found on her cast. This, too, makes it seem unlikely that she managed to hit Victim several times (even breaking the bat in the process) without some blood reaching the cast that was on her dominant hand.

¶97    The State's account was further corroborated by the testimony about motive. In her testimony, Girlfriend identified Samples's motive for the killing: Samples believed Victim killed his mother. This apparent belief was corroborated by Brother, who testified that Samples had spoken of Victim "maybe having something to do with [their] mother's death."

¶98 By contrast, there was scant evidence of Girlfriend having any motive to kill Victim. Indeed, Girlfriend and Victim had never met before that night. While Samples nevertheless testified that Girlfriend killed Victim because he was attempting to sexually assault her, Samples acknowledged that "[s]omething [was] just not adding up" with his own story because he couldn't "see [Victim] just grabbing somebody." And beyond that, there was reason for the jury to doubt Samples's general credibility. At trial, he confirmed that he had seventeen prior convictions, all of which involved him being "dishonest" in some form.

¶99 Girlfriend's account of the killing was further corroborated by Inmate 1, who said that Samples confided in him and confessed to killing Victim and then cutting off his finger to get the ring. We recognize that Inmate 2 testified that he never saw Samples and Inmate 1 talk to each other. But Inmate 2 acknowledged that he had only "briefly" lived on the same cell block as Inmate 1 and Samples, so the jury could have concluded that Inmate 2's testimony did not negate Inmate 1's.

¶100 Finally, there's the ring. At trial, Samples admitted that he cut off Victim's finger because he wanted to take his ring. This is abhorrent behavior by any stretch, and it would have corroborated the State's claims about Samples's state of mind, his antipathy toward Victim, and his disregard for the sanctity of human life. While Samples tried justifying this action by claiming that the ring had "sentimental" value to him, Samples then admitted that he threw the ring away a short time later, thus undermining his credibility with respect to his own description of his own supposed motivation.

¶101 In short, the jury was tasked with deciding who killed Victim: Samples or Girlfriend. Samples had two working arms and a known motive for the killing that was corroborated by two witnesses, and his acknowledged behavior after the killing was consistent with the State's insistence that he was the perpetrator

of this crime. By contrast, Girlfriend had a broken arm, no previously known motive for hurting Victim, and no blood on the cast that was on her arm the entire time. So when the jury heard Samples admit that his story sounded like "a ridiculous story," his concession was reflective of the overall evidentiary picture.

¶102   Given this, we have no hesitation in concluding that the effect of the various alleged errors—either individually or cumulatively—is not enough to "undermine[] our confidence that a fair trial was had." *Martinez-Castellanos*, 2018 UT 46, ¶ 39 (quotation simplified).

## CONCLUSION

¶103   We deny Samples's request for a rule 23B remand because his motion and proffer do not "support a determination that counsel was ineffective." Utah R. App. P. 23B(a).

¶104   We also conclude that Samples has not shown that he was prejudiced by any alleged error with respect to either the repetition of Girlfriend's out-of-court statements by Detective and Captain or Detective's equivocal statement about Girlfriend's ability to injure Victim. Finally, we are unpersuaded that the cumulative effect of the alleged errors requires reversal.

¶105   Affirmed.

———————